ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
AELISH M. BAIG (201279)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
aelishb@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY HEFLER, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          vs.<br><br>WELLS FARGO & COMPANY, JOHN G. STUMPF, JOHN R. SHREWSBERRY and CARRIE L. TOLSTEDT,<br><br>                              Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1.      Plaintiff, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of releases issued by Wells Fargo & Company ("Wells Fargo" or the "Company"), Wells Fargo's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**SUMMARY OF THE ACTION**

2.      This is a securities fraud class action on behalf of all persons who purchased Wells Fargo common stock between February 26, 2014 and September 15, 2016, inclusive (the "Class Period").  The action is brought against Wells Fargo, the Company's Chairman and Chief Executive Officer ("CEO"), John G. Stumpf ("Stumpf"), Wells Fargo's Chief Financial Officer ("CFO"), John R. Shrewsberry, and the Company's former Senior Executive Vice President of Community Banking, Carrie L. Tolstedt ("Tolstedt"), for violations of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

3.      Wells Fargo is a diversified financial services company that provides retail, commercial and corporate banking services, principally in the United States, and during the Class Period was the largest bank by market capitalization.  Defendant Wells Fargo is a Delaware corporation with its headquarters located in San Francisco, California.

4.      The Company has three reportable operating segments, Community Banking, Wholesale Banking, and Wealth and Investment Management.  According to the Company, the management accounting process measures the performance of the operating segments based on Wells Fargo's management structure and is not necessarily comparable with similar information for other financial services companies.  The operating segments are described below:

(a)      Community Banking:  The Company's Community Banking segment offers diversified financial products and services to consumers and small businesses that have annual sales

1   generally up to $5 million in which the owner is the financial decision maker.  Community Banking

2   also offers, among other things, investment management and other products and services to retail

3   customers and securities brokerages, including loan lines of credit, equipment and transportation

4   loans, education loans, residential mortgage loans and credit cards.

5           (b)     <u>Wholesale Banking</u>:  The Company's Wholesale Banking segment provides

6   financial solutions to businesses across the United States with annual sales generally in excess of $5

7   million and to financial institutions globally.  Wholesale Banking provides business banking,

8   commercial, corporate, capital markets, cash management and real estate banking products and

9   services.

10          (c)     <u>Wealth and Investment Management</u>:   The Wealth and Investment

11  Management segment provides personalized wealth management, investment and retirement

12  products and services to clients through Wells Fargo Advisors, The Private Bank, Abbot Downing,

13  Wells Fargo Institutional Retirement and Trust, and Wells Fargo Asset Management.

14          5.      As part of the Company's business strategy, throughout the Class Period, Wells Fargo

15  emphasized to investors, customers and employees that "cross-selling" was a key part of its strategy

16  to increase the number of retail products that each of its customers, or households, used.  For

17  example, if a customer held a mortgage with Wells Fargo, the cross-selling opportunity would be to

18  have the same customer open a credit card or a savings account, or get an auto loan.  Wells Fargo's

19  execution on these cross-selling opportunities was considered central to the Company's business and

20  growth prospects and recognized by the analyst community to be among Wells Fargo's best

21  performing business strategies.

22          6.      Cross-selling has generally been viewed as an essential performance metric and

23  defining characteristic of Wells Fargo, setting it apart from other banks.  The Company has often

24  been lauded for the effectiveness of its sales culture and cross-selling business model, which has

25  enabled Wells Fargo to dominate market share in comparison to other large banks.  Specifically,

26  Wells Fargo's cross-selling business model was designed to drive growth by selling new products to

27  existing customers versus relying on new client growth.  Wells Fargo's stated goal was to sell each

28  customer household at least eight consumer products, a selling motto called "Gr-eight."  According

to the Company, "[s]elling more products to our customers – 'cross-selling' – is very important to our business model and key to our ability to grow revenue and earnings."

7.     As part of the Community Banking segment, the Company's retail banking business was particularly successful in driving growth through "cross-sell."  Morningstar Corporate Credit Research wrote in July 2013 and again in early 2014 about client asset growth in Wells Fargo's retail banking unit, concluding that Wells Fargo's leadership and business strategy of cross-selling its products across clients and households was indeed vaunted and intact, which would lead to continued financial strength:

> *Retail brokerage client assets grew 12% during the year*, wealth management client assets expanded 7%, and retirement assets – both individual and institutional – grew by double digits.  *In our view, the fact that these balances are growing as fast as or faster than deposits is a sign that the company's vaunted cross-selling expertise is intact.  In fact, reported products per household grew across the bank's segments*.

8.     Consistent with this narrative, throughout the Class Period defendants concealed that a material part of the source of Wells Fargo's record cross-selling across the Company was based on fraudulent activity, notwithstanding its purported "continued . . . focus on meeting [its] customers' financial needs."

9.     Defendants' misrepresentations continued throughout the Class Period, as Wells Fargo reported financial results driven by its cross-selling in the Company's retail banking business and growth attributed to its cross-selling business model:

- • "*Our retail bank household cross-sell is now at 6.17 products, up from two years ago 5.98* . . . ."

- • "*Retail Banking household cross-sell ratio of 6.27 products per household, compared with 6.32 year-over- year*."

10.     While bragging about the Company's cross-selling prowess, defendants knew but deliberately failed to disclose known material true facts, including that the Company's cross-selling strategy was not focused on or designed to benefit customers, but was instead designed to fulfill sales quotas or otherwise advance the interests of Wells Fargo or its employees and increase sources of profitability, while simultaneously burdening customers with financial products they did not authorize, need and/or even know about.  In fact, defendants knew the Company's cross-sell strategy that they oversaw was fueled by a sales culture designed by Wells Fargo management that

incentivized and rewarded employees for pushing products on customers in order to show growth without regard for the impact on customers.  Thus, in order to meet cross-sell targets set by management, Wells Fargo employees illegally opened millions of accounts (deposit, credit, online banking services, etc.) by forging documents or by other fraudulent means without the consent of Wells Fargo's customers.

11.     This unlawful activity, driven by a sales culture engineered by defendants, was admittedly known to but not disclosed by the Company and its CEO, defendant Stumpf, before the commencement of the Class Period and was confirmed by internal investigations that resulted in the termination of thousands of employees.

12.     In the interim, however, the Individual Defendants (as defined below) profited handsomely from Wells Fargo's purportedly strong financial performance, collecting more than $44 million in performance-based incentive compensation for the same period during which the known fraudulent activity was occurring:

| Name | Incentive Compensation 2014-2015 |
|---|---|
| John G. Stumpf | $33,000,000 |
| Carrie L. Tolstedt | $15,150,000 |
| John R. Shrewsberry | $13,750,000 |
| **Total:** | **$61,900,000** |

13.     Moreover, according to the Company's 2014 and 2015 Proxy Statements filed on Schedule 14A with the SEC, this compensation was based on, among other things, the Company's purported exceptional performance in the following business areas:

- *growth in loans and deposits*;

- *building relationships with customers* in furtherance of the Company's vision to *satisfy their financial needs*;

- *reinforcing culture of risk management and accountability*; and

- *continued strong cross-sell ratios*.

14.     Similarly during the Class Period, while Wells Fargo's stock traded at artificially inflated prices of as high as $58.52 per share, defendants Stumpf and Tolstedt sold more than $31 million worth of Wells Fargo common stock:

| Name | Shares Sold | Insider Trading Proceeds |
|---|---|---|
| John G. Stumpf | 359,197 | $19,404,934 |
| Carrie L. Tolstedt | 219,835 | $11,818,330 |
| **Total:** | **579,032** | **$31,223,264** |

15.     On September 8, 2016, the U.S. Consumer Financial Protection Bureau ("CFPB") published a Consent Order with a Stipulation to its entry signed by Mary Mack, Executive Vice President of Wells Fargo Bank, detailing the Company's fraudulent practices, which were centered on a corporate culture intent on growing its cross-selling opportunities and unlawfully and without its customers' consent opening millions of unauthorized deposit and credit card accounts, and imposing a fine of more than $185 million.  The announcement noted that these facts were known to the Company through an internal investigation that had uncovered the fraudulent practices, not as a result of an independent government investigation:

**Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts**

Bank Incentives to Boost Sales Figures Spurred Employees to Secretly Open Deposit and Credit Card Accounts

. . . Today the Consumer Financial Protection Bureau (CFPB) fined Wells Fargo Bank, N.A. $100 million for the ***widespread illegal practice of secretly opening unauthorized deposit and credit card accounts***.  Spurred by sales targets and compensation incentives, employees boosted sales figures by covertly opening accounts and funding them by transferring funds from consumers' authorized accounts without their knowledge or consent, often racking up fees or other charges. ***According to the bank's own analysis, employees opened more than two million deposit and credit card accounts that may not have been authorized by consumers*** . . . .

"***Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses***," said CFPB Director Richard Cordray.

16.     The September 8, 2016 CFPB announcement explained that the illegal conduct was not only caused by rogue sales staff, but was driven by the Company's efforts to be the leader in cross-selling:

*In recent years, the bank has sought to distinguish itself in the marketplace as a leader in "cross selling"* these products and services to existing customers who did not already have them.

\*       \*       \*

Wells Fargo's violations include:

- *Opening deposit accounts and transferring funds without authorization* . . . .

- Applying for credit card accounts without authorization: *According to the bank's own analysis, Wells Fargo employees applied for roughly 565,000 credit card accounts that may not have been authorized by consumers*. . . .

- Issuing and activating debit cards without authorization . . . .

- *Creating phony email addresses to enroll consumers in online-banking services* . . . .

17.    On September 9, 2016, Piper Jaffray issued a report, titled "CFPB Settlement, Fallout May Be More Than Initially Expected," describing its expectation that Wells Fargo shares would trade lower in light of the revelations from the CFPB and the disclosure that Wells Fargo had terminated more than 5,300 employees for the opening of unauthorized accounts, noting that "*[w]e are incrementally more negative on shares of WFC following further revelations about the unauthorized account issues that have surfaced over the past day*."  In response, on September 9, 2016, the price of the Company's stock fell from a close of $49.90 per share on September 8, 2016, to close at $48.72 per share on September 9, 2016, on trading volume of 32 million shares.

18.    On September 13, 2016, *The Fiscal Times* published an article titled "The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients."  The article discussed in detail the history of the Company's high pressure sales practices, which culminated in the fraudulent conduct, noting specifically that the purpose of the scheme, *i.e.*, opening fake bank and credit card accounts, was primarily to show steady growth to investors, describing the scheme as a "securities fraud gambit":

**The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients**

Wells Fargo has habitually tried to cultivate a reputation as "the good bank."

\*       \*       \*

Now, it may sound strange to say that this was not, at the root, a consumer fraud case.  But it really wasn't.  *This was more of a securities fraud gambit, combined with wage theft, and that explains why the lack of accountability at the top in this matter is so galling*.

\*       \*       \*

*The idea here was to show steady quarterly growth to investors*. . . .

. . . *Growth in cross-selling plus growth in the customer base equals growth in earnings, investors assume*.

\*       \*       \*

*[T]he fake accounts goosed the stock price, directly benefiting executives.  That's securities fraud. Wells Fargo knew that the cross-selling metrics, which it put in its annual reports, were bogus* . . . .

19.     On September 13, 2016, the price of Wells Fargo stock fell again, from a close of $48.54 per share on September 12, 2016, to a close of $46.96 per share on September 13, 2016, on volume of 59 million shares traded.

20.     On September 14, 2016, *Bloomberg* published an article, titled "Wells Fargo's Fake Account Scandal Snares CEO Stumpf," which reported that Stumpf had been called to testify before Congress on September 20, 2016.  The Company was also asked to provide internal documents related to the timing and discovery of the employee misconduct.

21.     On September 16, 2016, *Reuters* published an article titled "Wells Fargo faces scrutiny over lack of sales scandal disclosure."  The article discussed the 7.5% stock price decline caused by revelations that the Company had created millions of bank accounts and applied for credit cards without account holders' permission.  The article noted specifically that Wells Fargo had given investors no indication of the scale and scope of the problems, the disclosure of which caused $19 billion in market losses.  The article stated in part:

A phantom account scandal at Wells Fargo & Co has put the U.S. bank's disclosure policies under a harsh spotlight.

Despite press reports that a federal regulator and the Los Angeles prosecutor were investigating sales practices at retail branches of the San Francisco-based lender, the bank, which agreed to a $190 million settlement, *gave investors no indication of the scale of the problem*.

*The surprise spooked investors and has lopped roughly $19 billion off its market value* since the probe disclosed last week that Wells employees had created

roughly 2 million accounts for customers without their knowledge in order to meet internal sales targets.  The bank has fired 5,300 people over the scandal.

While the settlement barely makes a dent in the $23 billion of profit the bank earned last year, *the scandal's aftermath has caused a 7.5 percent drop in Wells' stock compared with a roughly 2.4 percent decline for the Dow Jones US Banks Index*.

*          *          *

MATERIAL OR NOT?

The tactics deployed in its branches were not a surprise for Wells.  The bank had been looking into them since 2011, when it started firing employees over "inappropriate sales conduct."  A Los Angeles Times investigation published in 2013 described a "pressure-cooker sales culture" at the bank.

*No mention is made of the bank's internal probe, or authorities' probes in the "legal actions" section of its latest quarterly or annual securities filings*.  The bank also did not say until this week that during the second quarter it had set aside money for the settlement.

22.     On September 20, 2016, defendant Stumpf testified under oath before the Senate Committee on Banking, Housing and Urban Affairs.  Among other things, Stumpf admitted:

- The Company had pulled credit reports by the credit bureaus for credit cards that were not authorized.

- Stumpf and the Board knew in late 2013 that there was wrongdoing by employees in the Company's retail banking segment, including the unauthorized opening of bank and credit card accounts.

- In July 2016, when defendant Tolstedt announced her retirement, that retirement was in part precipitated by communications regarding the findings of an internal investigation of the unauthorized opening of accounts.

23.     During the hearing, Pennsylvania Senator Pat Toomey asked whether Wells Fargo had ever disclosed this misconduct in the Company's SEC filings.  According to Senator Toomey:

[W]e haven't been able to discover such a disclosure and the SEC clearly requires disclosure of material adverse circumstances.  And I don't know how this could not be deemed material.  I think the market cap lost nine percent over the last couple of weeks [and] that's pretty material.

*          *          *

[T]he reputational  damage done to the bank clearly is material.  And that has been manifested by this huge adverse movement in stock price.

Stumpf was unable to answer the question.

24.     Between September 8, 2016 and September 16, 2016, the Company's stock price declined 9%, from a close of $49.90 per share on September 8, 2016 to a close of $45.43 per share on September 16, 2016, as information about defendants' conduct and its impact on Wells Fargo's operations reached the market, inflicting billions of dollars of harm on plaintiff and other Wells Fargo shareholders.

## JURISDICTION AND VENUE

25.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

26.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Wells Fargo is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

27.     Plaintiff Gary Hefler purchased Wells Fargo common stock during the Class Period, as set forth in the certification attached hereto, and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

28.     Wells Fargo is a diversified financial services company that provides retail, commercial and corporate banking services principally in the United States.  Wells Fargo is a Delaware corporation with its headquarters located in San Francisco, California.

29.     Defendant Stumpf is, and was at all relevant times during the Class Period, Chairman of the Board of Wells Fargo.  In addition, Stumpf has served as Wells Fargo's CEO since 2007, as a director since 2006 and as President from 2005 until November 2015.  Stumpf received 2014 and 2015 compensation of $19.3 million and $19.3 million, respectively.

30.     Defendant John R. Shrewsberry ("Shrewsberry") is, and was at all relevant times during the Class Period, the Company's CFO.  Shrewsberry received 2014 and 2015 compensation of $8.1 million and $9.05 million, respectively.

31.     Defendant Tolstedt was at all relevant times during the Class Period until her resignation on July 31, 2016, the Company's Senior Executive Vice President of Community

Banking.  Tolstedt received 2014 and 2015 compensation of $9.5 million and $9.05 million, respectively.

32.    The defendants named in ¶¶29-31 are sometimes referred to herein as the "Individual Defendants."

**FALSE AND MISLEADING STATEMENTS**
**ISSUED DURING THE CLASS PERIOD**

33.    On February 26, 2014, the Company filed with the SEC its Report on Form 10-K for the fiscal year ended December 31, 2013.  Also on February 26, 2014, the Company filed with the SEC its 2013 Annual Report to Stockholders.  The 2013 Annual Report emphasized that the Company had generated "record earnings" because the Company had "continued to focus on meeting [its] customers' financial needs," and in doing so had "achieved record cross-sell across the Company."  The Company further explained that to satisfy its customers' financial needs, it was providing "financial products that fulfill their needs."  The 2013 Annual Report was filed as an Exhibit to the February 26, 2014 Form 10-K, and stated as follows:

> Our vision is to satisfy all our customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies.  ***Our primary strategy to achieve this vision is to increase the number of our products our customers utilize and to offer them all of the financial products that fulfill their needs.  Our cross-sell strategy, diversified business model and the breadth of our geographic reach facilitate growth in both strong and weak economic cycles***.  We can grow by expanding the number of products our current customers have with us, gain new customers in our extended markets, and increase market share in many businesses.

> **Financial Performance**

> We produced another outstanding year of financial results in 2013 and ended the year as America's most profitable bank.  ***We continued to demonstrate the benefit of our diversified business model by generating record earnings, growing loans and deposits*** . . . .

> Noteworthy items included:

> \*        \*        \*

> •        [O]ur deposit franchise continued to generate strong deposit growth, with total deposits up $76.3 billion, or 8%;

> \*        \*        \*

- *[W]e continued to focus on meeting our customers' financial needs and achieved record cross-sell across the Company*.

34.     In addition to the Company's financial performance, the 2013 Annual Report specifically discussed the impact of Wells Fargo's cross-selling efforts in each of its key business segments:

**Community Banking** offers a complete line of diversified financial products and services for consumers and small businesses. . . . *Cross-sell of our products is an important part of our strategy to achieve our vision to satisfy all our customers' financial needs. Our retail bank household cross-sell was a record 6.16 products per household in November 2013, up from 6.05 in November 2012 and 5.93 in November 2011. We believe there is more opportunity for cross-sell as we continue to earn more business from our customers*.   Our goal is eight products per household, which is approximately one-half of our estimate of potential demand for an average U.S. household.

*       *       *

**Wholesale Banking** provides financial solutions to businesses across the United States and globally with annual sales generally in excess of $20 million. . . . *Wholesale Banking cross-sell was a record 7.1 products per customer in September 2013, up from 6.8 in September 2012 and 6.5 in September 2011*.

*       *       *

**Wealth, Brokerage and Retirement** provides a full range of financial advisory services to clients using a planning approach to meet each client's financial needs. . . .   *Wealth, Brokerage and Retirement cross-sell reached a record 10.42 products per household in November 2013, up from 10.27 in November 2012 and 10.05 in November 2011*.

35.     The February 26, 2014 Form 10-K and 2013 Annual Report identified the Company's cross-selling efforts as a key to its success and purported to warn investors that if these efforts were unsuccessful, the Company's financial results could suffer:

*Our "cross-selling" efforts to increase the number of products our customers buy from us . . . is a key part of our growth strategy, and our failure to execute this strategy effectively could have a material adverse effect on our revenue growth and financial results. Selling more products to our customers – "cross-selling" – is very important to our business model and key to our ability to grow revenue and earnings* . . . .

36.     On April 11, 2014, the Company issued a release announcing its first quarter 2014 financial results.  The release detailed Wells Fargo's cross-selling efforts across it reporting lines, stating:

**WELLS FARGO REPORTS RECORD QUARTERLY NET INCOME**
**Q1 Net Income of $5.9 Billion, Up 14 Percent YoY; EPS of $1.05**

- Continued strong financial results:

    - Net income of $5.9 billion, up 14 percent from first quarter 2013
    - Diluted earnings per share (EPS) of $1.05, up 14 percent
    - Revenue of $20.6 billion, compared with $21.3 billion

    *       *       *

- Strong loan and deposit growth:

    - Total average loans of $823.8 billion, up $27.1 billion, or 3 percent from first quarter 2013

    *       *       *

Wells Fargo & Company reported record net income of $5.9 billion, or $1.05 per diluted common share, for first quarter 2014, up from $5.2 billion, or $0.92 per share, for first quarter 2013, and up from $5.6 billion, or $1.00 per share, for fourth quarter 2013.

"Our solid first quarter results again demonstrated the ability of our diversified business model to perform for shareholders," said Chairman and CEO John Stumpf. "*Our 265,000 team members remained focused on achieving our vision of serving the financial needs of our customers as we grew loans, deposits and increased cross-sell.*"

    *       *       *

**Regional Banking**

- Retail banking

    - Retail Bank household cross-sell ratio of 6.17 products per household, up from 6.10 year-over-year
    - Primary consumer checking customers up a net 5.1 percent year-over-year

    *       *       *

**Wholesale Banking**

    *       *       *

Wholesale Banking reported net income of $1.7 billion, down $369 million, or 17 percent, from fourth quarter 2013. Revenue of $5.6 billion decreased $392 million, or 7 percent, from prior quarter.

    *       *       *

- Cross-sell of 7.2 products per relationship up from 7.1 in prior quarter and 6.8 in first quarter 2013

**Wealth, Brokerage and Retirement**

\*       \*       \*

Wealth, Brokerage and Retirement (WBR) reported net income of $475 million, down $16 million, or 3 percent, from fourth quarter 2013.

\*       \*       \*

WBR cross-sell ratio of 10.42 products per household, up from 10.33 in first quarter 2013.

(Footnotes omitted.)

37.     On May 20, 2014, the Company held its Analyst Day conference for analysts and investors. During the conference the Company emphasized its efforts on cross-selling products to its clients and the financial results the Company had achieved due to the effectiveness of its cross-selling strategy.  For example, defendants characterized Wells Fargo's cross-selling performance as "legendary," stating:

[Stumpf:]  We have the broadest coast-to-coast banking franchise, and in serving these customers, we want to help them succeed financially. . . .

. . . But if I had to pick just one number, one area I would focus most on, I could only pick one, it would be revenue.  Because when you are growing revenue, you are growing the business.

\*       \*       \*

***And what is revenue?  It is deposits and loans and more credit cards, deeper cross-sell, longer relationships, more assets under management***.

\*       \*       \*

[Shrewsberry:] ***Our relationship focus and cross-sell capability is hopefully legendary at this point.  It has been our vision for decades.  We've stuck to it***.

38.     During the conference, defendant Tolstedt, head of Community Banking, discussed the financial performance of that segment and the growth resulting from its cross-selling efforts, emphasizing that Wells Fargo's cross-selling was "helping [its] customers succeed financially and meet[] all of their needs."  Tolstedt further stated:

Primary checking customers, those that use their accounts actively, grew 5% this year. . . .  We've also earned more business from our existing customers over the last two years.  For example, ***we saw outstanding growth in our credit card business with retail bank credit card penetration up 30%*** . . . .

\*       \*       \*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 13 -

Retail banking, when executed well, benefits from the economies of scale. We believe this scale allows us to serve each customer and deliver value efficiently. We translate these economics into a series of operating models.

First, the density model. Ensuring the right physical distribution density, format mix, and site quality so that we can grow households faster than the market, complemented by our very strong virtual distribution. ***Second, the cross-sell model. This ties directly to our vision of helping our customers succeed financially and meeting all of their needs. Together, the density and cross-sell model[s] drive revenue***.

\*       \*       \*

***The beneficial cycle of cross-sell continues. The more products the customers have with us, the better deal and greater value we can provide***. . . .

***Our retail bank household cross-sell is now at 6.17 products, up from two years ago 5.98, and at the time of the merger we were at 5.2. Our long-term goal continues to be an average cross-sell of 8 and achieving this goal will come with higher household purchase rates*** and growth in profitability.

39.     On May 21, 2014, UBS issued a report, titled "WFC promises more of the same," discussing the Company's Analyst Day comments and the emphasis on cross-selling to existing customers:

**Management is focused on growth and execution of cross-selling strategy**

WFC's investor day highlighted a growth strategy – the presentations mention growth 116 times versus 39 mentions of costs. The strategy for growth is unchanged and focuses on cross-selling across all products and client segments with particular attention paid to cards, wealth management (where pre-tax margin target was increased from 22% to 25%) and corporate banking.

40.     Defendants' statements set forth in ¶¶33-38 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made therein not misleading. These facts, which were known to or disregarded by each of the defendants, were:

(a)     Wells Fargo's cross-selling efforts to retail and commercial customers were neither designed to meet customers' financial needs nor drive customer satisfaction, but rather were the product of a carefully designed performance management system that resulted in the opening of millions of deposit and credit card accounts for customers without their knowledge in an effort to generate fee income for Wells Fargo and compensation rewards for Wells Fargo employees, including defendants;

(b)     The Company illegally, through forgery and other electronic means, applied for and opened credit card accounts on behalf of customers without their knowledge or consent;

(c)     The Company illegally, through forgery and other electronic means, opened bank deposit accounts on behalf of customers without their knowledge or consent;

(d)     The Company used fake e-mail addresses to enroll customers in online banking services and request debit cards, including the creation of personal identification numbers ("PINs"), without their knowledge or consent;

(e)     The defendants engineered a sales culture that was designed to incentivize and reward employees for pushing products on customers they did not want or need and rewarded employees for deposit and credit card accounts that were opened without customers' consent through forgery or other means;

(f)     An ongoing internal investigation had in fact determined by the beginning of the Class Period that employees in the Community Banking segment had engaged in a wide ranging scheme to inflate the Company's financial performance figures by opening millions of unauthorized deposit and credit card accounts, resulting in mass terminations of employees, ultimately reaching more than 5,000 firings;

(g)     The Company's reported cross-selling metrics and the financial results derived from them were the product of defendants' misconduct as detailed in (a)-(f) above.

41.     On September 10, 2014, the Company made a presentation at the Barclays Global Financial Services Conference.  During the conference, defendant Shrewsberry compared Wells Fargo's financial performance to its peers, noting that the Company generated more fee income than its peers in large part due to the Company's focus on earning more customer business through cross-selling:

> **[W]e generate more fee income per average assets than our peers. This outperformance demonstrates our consistent focus on earning more of our customers' business and our culture of cross-sell.**

42.     After the September 10, 2014 Barclays conference, Wells Fargo's stock traded above $51 per share.

43.     In November 2014, RBC Capital Markets met with defendants Stumpf, Shrewsberry and Tolstedt to discuss the Company's financial performance and future prospects.  On November 5, 2014, RBC issued a report, titled "Highlights from recent company visit," which discussed the meetings:

**Highlights from recent company visit**

Our view: After meeting management, we remain positive on Wells' prospects to continue to outperform many of its large bank peers.

Key points:

- **Meetings With Senior Management**.  We recently visited Wells Fargo and met several of its senior executives including the CEO, CFO, Treasurer, Chief Risk Officer, and Head of Consumer Banking. . . .

- **Attractive Growth Opportunities**.  Looking forward, Wells sees multiple growth opportunities across its business.  Loan growth has been broad based at a mid-to-high single-digit rate, and the pipeline looks solid heading into year-end given the improving economy and ongoing market share gains. ***To that end, Wells is willing to price more aggressively on the lending side, partly because it is confident in its ability to cross-sell other products and build a profitable relationship***.

44.     In January 2015, Morningstar issued a report discussing the Company's fourth quarter results, specifically noting the Company's cross-selling expertise and the growth of its credit card loans by $4 billion:

**Wells Fargo Advances Slowly but Surely in 4Q** 14 Jan 2015

Wells Fargo's full-year results, including net interest margin of only 3.11% and a 58% efficiency ratio – at the high end of its 55%-59% target . . . .

\*          \*          \*

***Wells Fargo also demonstrated a continued ability to cross-sell during the quarter.  The company added more than $4 billion in credit card loans during the year, including an expansion of its private-label business***.

45.     On February 25, 2015, the Company filed its Report on Form 10-K for the fiscal year ended December 31, 2014.  On the same day, the Company filed its Annual Report to Stockholders for fiscal 2014.  The 2014 Annual Report again emphasized the Company's cross-selling strategy:

**Financial Performance**

We completed another outstanding year of financial results in 2014 and remained America's most profitable bank.  We generated record earnings, produced strong loan and deposit growth, grew the number of customers we serve, improved

credit quality, enhanced our strong risk management practices, strengthened our capital and liquidity levels and rewarded our shareholders by increasing our dividend and buying back more shares. . . .

Noteworthy items included:

\*         \*         \*

- our loans increased $40.3 billion, up 5%, even with the planned runoff in our non-strategic/liquidating portfolios, and our core loan portfolio grew by $60.3 billion, up 8%;

- our deposit franchise continued to generate strong customer deposit growth, with total deposits up $89.1 billion, or 8%;

\*         \*         \*

- we continued to maintain solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014) . . . .

46.    The February 25, 2015 Form 10-K and 2014 Annual Report also detailed individual cross-selling performance by business segment:

**COMMUNITY BANKING** offers a complete line of diversified financial products and services for consumers and small businesses including checking and savings accounts, [and] credit and debit cards . . . . ***Our retail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012***.

\*         \*         \*

Wealth, Brokerage and Retirement cross-sell was 10.49 products per retail banking household in November 2014, up from 10.42 in November 2013 and 10.27 in November 2012.

47.    On April 14, 2015, the Company issued a release discussing its financial results for the first quarter of fiscal 2015.  The release discussed, among other things, the results of the Company's cross-selling efforts:

**WELLS FARGO REPORTS $5.8 BILLION IN NET INCOME**
**Diluted EPS of $1.04, Revenue Up 3 Percent from Prior Year**

\*         \*         \*

- Net income of $5.8 billion, compared with $5.9 billion in first quarter 2014

- • Diluted earnings per share (EPS) of $1.04, compared with $1.05
- • Revenue of $21.3 billion, up 3 percent

\*       \*       \*

- • ***Strong growth in average loans and deposits***:

  - • Total average loans of $863.3 billion, up $39.5 billion, or 5 percent, from first quarter 2014

\*       \*       \*

***Regional Banking***

- • Retail banking

  - • Primary consumer checking customers up 5.7 percent year-over-year
  - • ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over- year***

(Footnotes omitted.)

48.     On April 14, 2015, Morningstar issued a report underscoring that Wells Fargo had reported increased income of 6.7% sequentially for its largest unit, Community Banking.  It further reported that results in Wholesale Banking had increased 3.25%, stating that "[m]anagement attributed this growth to successful cross-selling with the Community Banking segment." Morningstar further noted that Wells Fargo was spending a great deal to incentivize its employees to cross-sell products:  "Wells Fargo's emphasis on cross-selling is associated with significant incentive spending.   We see these expenses as worthwhile in building long-term customer relationships an consequently, switching costs."

49.     On May 29, 2015, the Company gave a presentation at the Sanford C. Bernstein Strategic Decisions Conference.  During the conference, defendant Stumpf was specifically asked about regulatory investigations and whether he was concerned that the Company was pushing products onto customers that the customers did not want.  Stumpf rejected the notion that Wells Fargo could cross-sell customers products they did not need, as such conduct was not in the best interest of its customers or Wells Fargo.  Instead, according to Stumpf, the Company's culture was one that helped customers succeed financially:

[Analyst:] There's a question about the regulatory investigations. A key part of your strategy has been sales. You have always been revenue focused on cross-selling. Sometimes that might be able to go too far and I guess there's been some investigations; *are you selling the wrong thing to the wrong people?*

*How do you make sure you're pushing a sales culture but not giving a customer something that they don't need or don't understand*?

[Stumpf:] Absolutely.  Our culture for 163 years has been to help our customers succeed financially and provide all their financial needs.  *It is not in our interest, not in our team members' interest, not in our customers' interest, surely not in our shareholders' interest to have a customer have a product or service they didn't want, don't need, or it doesn't help them*.

50.     After the May 29, 2015 Sanford C. Bernstein conference, Wells Fargo's stock price continued to trade above $56 per share.

51.     On June 23, 2015, Morningstar published a report, titled "Recent Housing Data Supports Our Case for an Accelerated, Above-Consensus Recovery," which consolidated its recently published research and noted that the Company's business had been expertly overseen by Stumpf and was not "too big to manage."  Importantly, Morningstar noted that the Company gave employees incentives to grow their cross-selling efforts, and therefore investors should not be concerned with increases in the Company's overall headcount:

*Wells Fargo's longstanding focus on cross-selling helps lock in customer relationships and access to low-cost funding – namely, $1 trillion in deposits at a cost of only 9 basis points as 2014 came to a close.*

\*        \*        \*

The company's simple, domestically focused business is clearly not "too big to manage" as the company has thrived under the leadership of several CEOs.  Though the company expects its efficiency ratio to be at the high end of its 55%-59% target for 2015, we don't view increases in headcount negatively.  Along these lines, *Wells Fargo's emphasis on cross-selling is associated with significant incentive spending.  We see these expenses as worthwhile in building long-term customer relationships and consequently, switching costs*.

52.     On July 14, 2015, the Company reported its financial results for the second quarter of fiscal 2015.  The Company noted the cross-selling results for its three business units, with growth in two out of the three units:

**WELLS FARGO REPORTS $5.7 BILLION IN NET INCOME**
**Diluted EPS of $1.03, Revenue of $21.3 Billion**

•      Continued strong financial results:

- Net income of $5.7 billion, in line with second quarter 2014
- Diluted earnings per share (EPS) of $1.03, compared with $1.01

\* \* \*

- Strong growth in average loans and deposits . . . .

\* \* \*

***Regional Banking***

- Retail banking

  - Primary consumer checking customers up 5.6 percent year-over-year.
  - ***Retail Bank household cross-sell ratio of 6.13 products per household, compared with 6.17 year-over- year***.

\* \* \*

**Wholesale Banking**

\* \* \*

Wholesale Banking reported net income of $2.0 billion, up $214 million, or 12 percent, from first quarter 2015.  Revenue of $6.1 billion increased $171 million, or 3 percent, from prior quarter.  Net interest income increased $147 million, or 5 percent, on broad based loan growth . . . .

\* \* \*

**Wealth, Brokerage and Retirement**

\* \* \*

***WBR cross-sell ratio of 10.53 products per household, up from 10.44 a year ago***

(Footnotes omitted.)

53.     On February 24, 2016, Wells Fargo filed its Report on Form 10-K for the year ended December 31, 2015.  The Form 10-K was signed by defendants Stumpf and Shrewsberry.  On the same day, the Company also issued its Annual Report to Stockholders, which noted the importance of cross-selling products to its customers to create a financial ecosystem purportedly for the ***benefit*** and ***need*** of its customers:

> **Cross-sell** . . . Cross-sell is the result of serving our customers well, understanding their financial needs and goals over their lifetimes, and ensuring we innovate our products, services and channels so that we earn more of their business and help them succeed financially.  ***Our approach to cross-sell is needs-based as some customers will benefit from more products***, and some may need fewer.  We believe there is continued opportunity to meet our customers' financial needs as we

build lifelong relationships with them. ***One way we track the degree to which we are satisfying our customers' financial needs is through our cross-sell metrics***, which are based on whether the customer is a retail banking household or has a wholesale banking relationship. . . .

> ***We report cross-sell metrics for Community Banking and WIM based on the average number of retail products used per retail banking household***. . . .

> ***Products included in our retail banking household cross-sell metrics must be retail products and have the potential for revenue generation and long-term viability***.

54.   With respect to the Community Banking segment, of which retail banking was a part, Wells Fargo stated as follows:

> ***Our retail banking household cross-sell was 6.11 products per household in November 2015, compared with 6.17*** in November 2014 and 6.16 in November 2013.

55.   On April 14, 2016, the Company announced its financial results for the first quarter of fiscal 2016, discussing, among other things, the impact of cross-selling on its retail banking unit:

**WELLS FARGO REPORTS $5.5 BILLION IN QUARTERLY NET INCOME; Diluted EPS of $0.99; Revenue Up 4 Percent from Prior Year Regional Banking**

- Continued strong financial results:
  - Net income of $5.5 billion, compared with $5.8 billion in first quarter 2015
  - Diluted earnings per share (EPS) of $0.99, compared with $1.04
    - First quarter 2015 results included discrete tax benefit of $359 million, or $0.07 per share
  - Revenue of $22.2 billion, up 4 percent
  - Pre-tax pre-provision profit of $9.2 billion, up 5 percent
  - Return on assets (ROA) of 1.21 percent and return on equity (ROE) of 11.75 percent

\*       \*       \*

- Retail Banking
  - Primary consumer checking customers up 5.0 percent year-over-year
  - Debit card purchase volume of $72 billion in first quarter, up 9 percent year-over-year
  - ***Retail Bank household cross-sell ratio of 6.09 products per household, compared with 6.13 year-over-year***

\*       \*       \*

**<u>Wholesale Banking</u>**

\*       \*       \*

Wholesale Banking reported net income of $1.9 billion, down $183 million, or 9 percent, from fourth quarter 2015. Revenue of $7.0 billion increased $399 million, or 6 percent, from prior quarter and included the acquisitions of GE Railcar Services (closed 1/1/16) and GE Capital's North American Commercial Distribution Finance and Vendor Finance businesses (closed 3/1/16).

\* \* \*

- ***Cross-sell of 7.3 products per relationship, up from 7.2 products in first quarter 2015***

(Footnotes omitted.)

56.     On May 24, 2016, the Company held an Analyst Day conference in San Francisco for analysts and investors.  The conference was hosted by defendants Stumpf and Tolstedt.  During the conference, defendant Tolstedt stated with respect to "***products per household or cross-sell, the first thing we anchor ourselves on is our vision of satisfying our customers' needs and helping them succeed financially.  And so everything that we do is really about that***."

57.     On May 25, 2016, Evercore issued a report discussing the Company May 24, 2016 conference titled "Investor Day Wrap: Targets Sliced, but Still a Conservative Drive Down the Fairway."   The report discussed, among other things, the growth in the Company's credit card business due to its cross-selling ability:

**Wells Fargo hosted its Investor Day yesterday in San Francisco**.

Bottom line: While long-term profitability targets were cut due to the challenging rate and operating environment, such is not a major surprise, and we remain positive on the bank's L/T above-peer returns.

\* \* \*

**Card biz growth to remain above industry pace with greater cross-sell and new products**.

WFC expects to continue to grow its $25B consumer credit card book (2.6% of loans) via new cards to existing and new customers.  WFC plans to introduce a new, refreshed card product with richer rewards (1.5% cash back). ***Mgmt noted they have improved their penetration rates with 43.2% of checking customers now holding a WFC card, versus 33.5% in 2012***.  Lastly, competition in the card business remains brisk, albeit mainly on the co-branding side.

58.     On July 15, 2016, the Company  issued a press release announcing its financial results for the second quarter of fiscal 2016.  The release discussed the cross-selling results, this time only for the Company's retail banking unit:

**WELLS FARGO REPORTS $5.6 BILLION IN QUARTERLY NET INCOME;**
**Diluted EPS of $1.01; Revenue Up 4 Percent from Prior Year**

- Continued strong financial results:

  - Net income of $5.6 billion, compared with $5.7 billion in second quarter 2015
  - Diluted earnings per share (EPS) of $1.01, compared with $1.03
  - Revenue of $22.2 billion, up 4 percent

- Strong growth in loans and deposits:

  *          *          *

- ***Regional Banking***

  - Retail Banking
    - Primary consumer checking customers up 4.7 percent year-over-year
    - Debit card purchase volume of $76.4 billion in second quarter, up 8 percent year-over-year
    - ***Retail Banking household cross-sell ratio of 6.27 products per household, compared with 6.32 year-over- year***

(Footnotes omitted.)

59. On July 15, 2016, the Company held a conference call for analysts and investors to discuss the Company's second quarter 2016 financial results. During the call, defendant Stumpf noted that the Company had previously announced that defendant Tolstedt, the Head of the Community Banking segment, was retiring. Stumpf concealed the fact that the Company had made substantial findings of the unlawful activity and actual fraud in its Community Banking segment as part of its investigation, which not only exposed millions of customers to unlawful fees and potential identity theft, but put the Company in the crosshairs of federal investigations. Instead, defendants emphasized that Wells Fargo was committed to "transparency[] and ensur[ing] customers are receiving the right products to meet their financial needs," with Stumpf claiming that Tolstedt had built an extraordinary franchise that met the needs of millions of customers:

> [Stumpf:] Before I conclude, I want to highlight the announcement we made earlier this week, Carrie Tolstedt, Head of Community Banking who has been with Wells Fargo for 27 years has decided to retire at year end. She and her team have built an extraordinary franchise, one that meets the needs of millions of customers nationwide, and has served investors very well for decades.

60. During the call, defendant Shrewsberry stated:

Turning to our business segments, starting on page 14, community banking earned $3.2 billion in the second quarter, down 1% from a year ago, and 4% from the first quarter. . . .

***We continually work to enhance customer satisfaction and transparency, and ensure customers are receiving the right products to meet their financial needs, because the key to our success is long-lasting customer relationships built on trust***.

61.     Following the release of Wells Fargo's financial results on July 15, 2016 through September 16, 2016, Wells Fargo stock traded at prices above $50 per share.

62.     Defendants' statements set forth in ¶¶41, 45-47, 49, 52-56 and 58-60 were materially false and misleading when made in that they misrepresented and/or omitted material facts necessary to make the statements made therein not misleading.  These facts, which were known to or disregarded by each of the defendants, were:

(a)     Wells Fargo's cross-selling efforts to retail and commercial customers were neither designed to meet customers' financial needs nor drive customer satisfaction, but rather were the product of a carefully designed performance management system that resulted in the opening of millions of deposit and credit card accounts for customers without their knowledge in an effort to generate fee income for Wells Fargo and compensation rewards for Wells Fargo employees, including defendants;

(b)     The Company illegally, through forgery and other electronic means, applied for and opened credit card accounts on behalf of customers without their knowledge or consent;

(c)     The Company illegally, through forgery and other electronic means, opened bank deposit accounts on behalf of customers without their knowledge or consent;

(d)     The Company used fake e-mail addresses to enroll customers in online banking services and request debit cards, including the creation of PINs, without customers' knowledge or consent;

(e)     The defendants engineered a sales culture that was designed to incentivize and reward employees for pushing products on customers they did not want or need and rewarded employees for bank and credit card accounts that were opened without the customers' knowledge through forgery or other means;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 24 -

(f)      An ongoing internal investigation had in fact found that in excess of 5% of the employees in the Community Banking segment had engaged in a wide ranging scheme to inflate the Company's financial performance figures by, among other things, opening millions of unauthorized deposit and credit card accounts, resulting in mass terminations of employees, ultimately reaching more than 5,000 firings;

(g)      That, in an effort to conceal the breadth of defendants' fraudulent cross-selling scheme, defendants Wells Fargo and Stumpf agreed that they would not terminate defendant Tolstedt for overseeing the fraudulent activities in the Community Banking segment, but rather would allow her to retire, notwithstanding her leadership over and oversight of the misconduct in the Community Banking segment, and thereby permit her to pocket more than $90 million; and

(h)      The Company's reported cross-selling metrics and the financial results derived from them were the product of defendants' misconduct as detailed in (a)-(g) above.

## THE TRUE FACTS BEGIN TO BE DISCLOSED

63.      On September 8, 2016, the CFPB published its Consent Order with Wells Fargo detailing the Company's fraudulent practices, which were centered on a corporate culture intent on growing its cross-selling opportunities and unlawfully and without its customers' consent opening millions of unauthorized deposit and credit card accounts, and imposing a fine of more than $185 million.  The announcement noted that these facts were known to the Company through an internal investigation that had uncovered the fraudulent practices, and not as a result of an independent government investigation:

**Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts**

Bank Incentives to Boost Sales Figures Spurred Employees to Secretly Open Deposit and Credit Card Accounts

Today the Consumer Financial Protection Bureau (CFPB) fined Wells Fargo Bank, N.A. $100 million for the ***widespread illegal practice of secretly opening unauthorized deposit and credit card accounts***.  Spurred by sales targets and compensation incentives, employees boosted sales figures by covertly opening accounts and funding them by transferring funds from consumers' authorized accounts without their knowledge or consent, often racking up fees or other charges. ***According to the bank's own analysis, employees opened more than two million deposit and credit card accounts that may not have been authorized by consumers*** . . . .

*"Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses,"* said CFPB Director Richard Cordray.

64.     The CFPB announcement explained that the illegal conduct was not only caused by rogue sales staff, but had been driven by the Company's effort to be the leader in cross-selling:

> *In recent years, the bank has sought to distinguish itself in the marketplace as a leader in "cross selling"* these products and services to existing customers who did not already have them.  When cross selling is based on efforts to generate more business from existing customers based on strong customer satisfaction and excellent customer service, it is a common and accepted business practice.  *But here the bank had compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking*, and the bank failed to monitor the implementation of these programs with adequate care.

> According to today's enforcement action, thousands of Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets.  The Dodd-Frank Wall Street Reform and Consumer Protection Act prohibits unfair, deceptive, and abusive acts and practices.  Wells Fargo's violations include:

> - *Opening deposit accounts and transferring funds without authorization*: According to the bank's own analysis, employees opened roughly 1.5 million deposit accounts that may not have been authorized by consumers.  *Employees then transferred funds from consumers' authorized accounts to temporarily fund the new, unauthorized accounts*.  This widespread practice gave the employees credit for opening the new accounts, allowing them to earn additional compensation and to meet the bank's sales goals.  *Consumers, in turn, were sometimes harmed because the bank charged them for insufficient funds* or overdraft fees because the money was not in their original accounts.

> - Applying for credit card accounts without authorization: *According to the bank's own analysis, Wells Fargo employees applied for roughly 565,000 credit card accounts that may not have been authorized by consumers.  On those unauthorized credit cards, many consumers incurred annual fees*, as well as associated finance or interest charges and other fees.

> - Issuing and activating debit cards without authorization: Wells Fargo employees requested and issued debit cards without consumers' knowledge or consent, going so far as to create PINs without telling consumers.

> - *Creating phony email addresses to enroll consumers in online-banking services*: Wells Fargo employees created phony email addresses not belonging to consumers to enroll them in online-banking services without their knowledge or consent.

65.     On September 9, 2016, Piper Jaffray issued a report, titled "CFPB Settlement, Fallout May Be More Than Initially Expected," which described its expectation that Wells Fargo shares

would trade lower in light of the revelations of the CFPB and the disclosure that Wells Fargo had terminated more than 5,300 employees for the opening of unauthorized accounts:

> ***We are incrementally more negative on shares of WFC following further revelations about the unauthorized account issues that have surfaced over the past day***.  Since our initial note (here), we learned that 5,300 employees have been let go due to their involvement in setting up unauthorized accounts, which was a bigger amount than we initially expected given WFC was considered one of the better-managed large banks (2% of workforce).  ***In addition, the public relations fallout appears larger than we initially expected*** given the optics of the issue at hand.  We expect this additional spotlight on WFC could open the bank to greater scrutiny from regulators and community groups, particularly if the broader public continues to take an interest in the issue (e.g., an article in Vanity Fair magazine).

> • . . . ***We would expect the stock to see incremental pressure in the near-term*** given the issues described will bring up a series of questions about internal controls within the bank.

> \*        \*        \*

> • . . . ***We believe WFC will have a difficult time meeting Street expectations for earnings growth in a low rate environment while the stock screens as expensive at 13.0x***.

66.    On September 9, 2016, the price of the Company's stock fell from the prior day's close of $49.90 per share to a close of $48.72 per share on September 9, 2016, on trading volume of 32 million shares.

67.    On September 13, 2016, *The Fiscal Times* published an article titled "The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients."  The article noted that the purpose of the scheme, which resulted in the charges by the CFPB, was primarily to show steady growth to investors, describing the scheme as a "securities fraud gambit":

> **The Real Scandal at Wells Fargo: Execs Got Rich by 'Sandbagging' Clients**

> Wells Fargo has habitually tried to cultivate a reputation as "the good bank." Its executives maintain with pride that they stay away from high-risk investment products, and focus on traditional banking, with the highest ethical standards.

> Except for the part where bank employees created over 2 million fake accounts in their customers' names.

> The Consumer Financial Protection Bureau (CFPB), Office of the Comptroller of the Currency and the Los Angeles City Attorney fined Wells Fargo $185 million last week for generating fictitious accounts over a five-year period. Employees forged signatures, conjured phony email addresses and shifted funds between real and phony accounts, sometimes generating unwarranted fees for customers.

Now, it may sound strange to say that this was not, at the root, a consumer fraud case.  But it really wasn't.  *This was more of a securities fraud gambit, combined with wage theft, and that explains why the lack of accountability at the top in this matter is so galling*.

What drove this scheme?  The whole story could be found in the pages of the Los Angeles Times nearly three years ago (they gift-wrapped this investigation, first for the City Attorney and then for the federal regulators who piled on).  *Wells Fargo regional managers gave their branch offices daily quotas to "cross-sell" financial products to existing customers. If someone had a checking account, you sign them up for a savings account.  Or a credit or debit card.  Or online banking services*.

Former CEO Dick Kovacevich actually invented a target for each customer called the "Gr-eight initiative" – eight add-on products per household.  This is the equivalent of a used car salesman up-selling the undercoating.   (Hilariously, Kovacevich is now on the board of another fraudulent company, Theranos).

Employees who missed sales quotas would have to work weekends or stay late to catch up.  They were also threatened with firing.  To handle the pressure, some employees opened accounts or ordered credit cards without customer permission.  *Wells Fargo says 5,300 workers have been fired for such conduct over the past five years*.

The goal of this enterprise was not really to make money through fees on the add-on products.  CFPB's complaint states that only 85,000 of the 1.5 million fake accounts incurred fees (of about $2 million), and just 14,000 of the half-million unauthorized credit cards incurred fees (of about $400,000). . . .   Consumers who have to deal with the aftermath – hits to their credit score, the mandatory arbitration they're locked into on accounts they never asked for – suffered additional harm.

*The idea here was to show steady quarterly growth to investors.  The daily sales quotas weren't plucked from the sky, but designed to maintain industry leadership in cross-selling*. . . .  The bank tracks cross-selling metrics; the average Wells Fargo retail banking customer had 6.11 products at the end of 2015.

Multiple accounts signal to Wall Street that Wells maintains deep relationships with its customers, meaning that the bank will keep making money off them.  *Growth in cross-selling plus growth in the customer base equals growth in earnings, investors assume.  Wells Fargo stock doubled from 2011 to mid-August 2015, the period described in the fraud complaint*.

Now keep in mind that John Stumpf, the CEO of Wells, took $155 million in stock options between 2012 and 2015, as the share price soared, in part based on the successful cross-selling strategy.  And, as Fortune reported yesterday, the executive who oversaw the banking unit the entire time those millions of fake accounts were opened is "retiring" with a $124.6 million golden parachute.  *So the fake accounts goosed the stock price, directly benefiting executives.  That's securities fraud.  Wells Fargo knew that the cross-selling metrics, which it put in its annual reports, were bogus; it didn't fire all 5,300 employees last week, but over a five-year period.  Yet the bank continued to promote those numbers to investors without informing them of the fake account generation*.

68.     Also on September 13, 2016, *The Motley Fool* published an article about defendant Tolstedt, who oversaw the Community Banking segment wherein thousands of employees had created millions of fake bank and credit card accounts:

**Wells Fargo's Massive Fraud Made This Woman Filthy Rich**

**Overseeing a massive fraud translated into generational wealth for one Wells Fargo executive.**

Just in case you weren't outraged enough at the fact that thousands of employees at Wells Fargo fraudulently opened up to 2 million accounts for customers without their consent, then I have a chart for you. ***It reveals the one person who, more than anyone else, appears to have personally benefited from the fraud***.

I'm referring to Carrie Tolstedt, the executive who oversaw Wells Fargo's community banking division for much of the past decade.  That includes the years from 2011 to 2015, when more than 5% of the employees under her watch engaged in a wide-ranging, systematic scheme to boost revenue by taking advantage of millions of unwitting customers.

As an aside, Wells Fargo claims that only 1% of its employees engaged in this behavior. This is based on the fact that it fired approximately 1,000 employees a year over five years, equating to 1% of its branch-based staff each year.  But if you aggregate the terminations, which I believe offers a more accurate reflection of the underlying point, then you get 5,300 terminations, or 5.3% of its 100,000 branch-based employees.

Wells Fargo reported two months ago that Tolstedt had decided to retire at the end of this year, though she stepped down from her role overseeing the bank's branch network on July 31.  "A trusted colleague and dear friend, Carrie Tolstedt has been one of our most valuable Wells Fargo leaders, a standard-bearer of our culture, a champion for our customers, and a role model for responsible, principled and inclusive leadership," said chairman and CEO John Stumpf at the time.

As a parting gift, Tolstedt will earn a purported $93 million payday, according to *The Financial Times*, the lion's share of which stems from the exercise of stock awards that she received from the bank along the way.  The bank's latest proxy filing shows that the 27-year Wells Fargo veteran owns more than 2.5 million shares of stock in one way, shape, or form.

69.     On September 13, 2016, the Company announced that it would eliminate the sales goals and incentives that drove the culture and environment known to defendants to have substantially contributed to the fraudulent conduct:

**Wells Fargo to Eliminate Product Sales Goals for Retail Bankers**

***Wells Fargo & Company, announced today that it will eliminate all product sales goals in retail banking, effective January 1, 2017.***

1    "Our objective has always been and continues to be to meet our customers'
2    financial needs and drive customer satisfaction," said CEO John Stumpf. "We are
     eliminating product sales goals because we want to make certain our customers have
3    full confidence that our retail bankers are always focused on the best interests of
     customers."

4    "We believe this decision is both good for our customers and good for our
5    business. The key to our success is the lifelong relationships that result from
     providing each customer with great value.  For the past several years, we have
6    significantly strengthened our training programs, controls and oversight and have
     evolved our model to ensure we are rewarding deeper relationships and providing
7    excellent customer service.  The elimination of product sales goals represents another
     step to reinforce our service culture, helps ensure that nothing gets in the way of our
8    ability to achieve our mission, and is consistent with our commitment to providing a
     great place to work," concluded Stumpf.

9        70.    On September 13, 2016, the price of Wells Fargo stock fell another 3%, from a close

10   of $48.54 per share on September 12, 2016, to a close of $46.96 per share on September 13, 2016, on

11   volume of 59 million shares traded.

12       71.    On September 14, 2016, *Bloomberg* published an article, titled "Wells Fargo's Fake

13   Account Scandal Snares CEO Stumpf," which reported that Stumpf had been subpoenaed to testify

14   before Congress on September 20, 2016:

15   Wells Fargo's scandal surrounding allegations that it opened two million
     accounts for customers without their knowledge is proving to be far-reaching. Chief
16   Executive Officer John Stumpf faces damage to the bank's reputation and his
     personal legacy and has been called to testify before Congress next week, while
17   investor Warren Buffett lost $1.4 billion after Wells Fargo shares fell 3.3 percent.

18       72.    On September 16, 2016, *Reuters* published an article titled "Wells Fargo faces

19   scrutiny over lack of sales scandal disclosure."  The article discusses the 7.5% stock price decline

20   caused by revelations that the Company had created millions of bank accounts and applied for credit

21   cards without account holders' permission.  The article noted specifically that Wells Fargo had given

22   investors no indication of the scale and scope of the problems, the disclosure of which caused $19

23   billion in market losses.  The article stated:

24   A phantom account scandal at Wells Fargo & Co has put the U.S. bank's
     disclosure policies under a harsh spotlight.
25
26   Despite press reports that a federal regulator and the Los Angeles prosecutor
     were investigating sales practices at retail branches of the San Francisco-based
     lender, the bank, which agreed to a $190 million settlement, gave investors no
27   indication of the scale of the problem.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                      - 30 -

The surprise spooked investors and has lopped roughly $19 billion off its market value since the probe disclosed last week that Wells employees had created roughly 2 million accounts for customers without their knowledge in order to meet internal sales targets.  The bank has fired 5,300 people over the scandal.

While the settlement barely makes a dent in the $23 billion of profit the bank earned last year, *the scandal's aftermath has caused a 7.5 percent drop in Wells' stock compared with a roughly 2.4 percent decline for the Dow Jones US Banks Index*.

Investors, analysts and legal experts who spoke to Reuters said Wells Fargo' silence did not mean it had broken the law.  But there is broad agreement that it made matters worse by not being more forthcoming with Chief Executive John Stumpf under pressure to explain why this happened on his watch.

"Look, they're lawyered up to the sky.  They did the minimum legally required.  Do I think that that's fair to investors or that that's all that investors need to know or want to know?  No I do not," said Nell Minow, vice chair of ValueEdge advisors, a corporate governance advisory firm.

"*It further diminishes their already significantly diminished credibility in terms of their willingness to be transparent*."

*        *        *

Meanwhile, Stumpf will testify before the Senate Banking Committee next week and U.S. prosecutors have begun an investigation into the bank's sales practices.

"It is a scandal of almost unimaginable proportions," former U.S. Securities and Exchange Commission Chairman Arthur Levitt told Reuters this week.  "You cannot hold management immune from its consequences."

MATERIAL OR NOT?

The tactics deployed in its branches were not a surprise for Wells.  The bank had been looking into them since 2011, when it started firing employees over "inappropriate sales conduct."  A Los Angeles Times investigation published in 2013 described a "pressure-cooker sales culture" at the bank.

*No mention is made of the bank's internal probe, or authorities' probes in the "legal actions" section of its latest quarterly or annual securities filings*.  The bank also did not say until this week that during the second quarter it had set aside money for the settlement.

Stumpf has since apologized and said management takes responsibility for what happened.  Spokesman Mark Folk said the bank did not believe it had to disclose information to investors ahead of the settlement.

"Each quarter, we consider all available relevant and appropriate facts and circumstances in determining whether a litigation matter is material and disclosed in our public filings," he said.  "Based on that review, we determined that the matter was not material."

*        *        *

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Experts said Wells Fargo would have been wise to at least flag the issue earlier.

"They should have tried to get control over the release of the news, so that it wasn't a bombshell that went off on someone else's schedule." Said Erik Gordon, a University of Michigan business professor.

"Now they're in the terrible position of looking like they did something and hid it."

73.     On September 20, 2016, defendant Stumpf testified under oath before the Senate Committee on Banking, Housing and Urban Affairs.  Among other things, Stumpf admitted:

- The Company had pulled credit reports by the credit bureaus on cards that were not authorized.

- Stumpf and the Board knew in late 2013 that there was wrongdoing by employees in Wells Fargo's retail banking segment, including the unauthorized opening of bank and credit card accounts.

- In July 2016, when defendant Tolstedt announced her retirement, that retirement was in part precipitated by communications regarding the findings of an internal investigation of the unauthorized opening of accounts.

74.     During the hearing, Pennsylvania Senator Pat Toomey asked whether Wells Fargo had ever disclosed this misconduct in the Company's SEC filings.  According to Senator Toomey:

[W]e haven't been able to discover such a disclosure and the SEC clearly requires disclosure of material adverse circumstances.  And I don't know how this could not be deemed material.  I think the market cap lost nine percent over the last couple of weeks [and] that's pretty material.

*        *        *

[T]he reputational  damage done to the bank clearly is material.  And that has been manifested by this huge adverse movement in stock price.

Stumpf was unable to answer the question.

## LOSS CAUSATION/ECONOMIC LOSS

75.     During the Class Period, as detailed herein, Wells Fargo and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Wells Fargo common stock and operated as a fraud or deceit on Class Period purchasers of Wells Fargo common stock by misrepresenting the Company's business and prospects.  Later, when the defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Wells Fargo common stock declined as

the prior artificial inflation came out of the price over time.  As a result of their purchases of Wells Fargo common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF PRESUMPTION OF
RELIANCE: FRAUD ON THE MARKET**

76.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Wells Fargo common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

77.     At all relevant times, the market for Wells Fargo common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Wells Fargo filed periodic public reports with the SEC; and

(b)     Wells Fargo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**CLASS ACTION ALLEGATIONS**

78.     Plaintiff brings this action as a class action on behalf of all persons who purchased Wells Fargo common stock during the Class Period.  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of

1   their immediate families and their legal representatives, heirs, successors or assigns and any entities

2   in which defendants have or had a controlling interest.

3        79.   The members of the Class are so numerous that joinder of all members is

4   impracticable.  The disposition of their claims in a class action will provide substantial benefits to

5   the parties and the Court.  Wells Fargo has more than 5 billion shares of stock outstanding, owned by

6   hundreds if not thousands of persons.

7        80.   There is a well-defined community of interest in the questions of law and fact

8   involved in this case.  Questions of law and fact common to the members of the Class that

9   predominate over questions that may affect individual Class members include:

10              (a)   Whether the 1934 Act was violated by defendants;

11              (b)   Whether defendants omitted and/or misrepresented material facts;

12              (c)   Whether defendants' statements omitted material facts necessary in order to

13   make the statements made, in light of the circumstances under which they were made, not

14   misleading;

15              (d)   Whether defendants knew or recklessly disregarded that their statements were

16   false and misleading;

17              (e)   Whether the price of Wells Fargo common stock was artificially inflated; and

18              (f)   The extent of damage sustained by Class members and the appropriate

19   measure of damages.

20        81.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class

21   sustained damages from defendants' wrongful conduct.

22        82.   Plaintiff will adequately protect the interests of the Class and has retained counsel

23   who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

24   with those of the Class.

25        83.   A class action is superior to other available methods for the fair and efficient

26   adjudication of this controversy.

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 34 -

## COUNT I

### For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5
### Against All Defendants

84.     Plaintiff incorporates ¶¶1-83 by reference.

85.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wells Fargo common stock during the Class Period.

87.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wells Fargo common stock.  Plaintiff and the Class would not have purchased Wells Fargo common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Defendants Stumpf and Wells Fargo

88.     Plaintiff incorporates ¶¶1-87 reference.

89.     Defendant Stumpf acted as a controlling person of Wells Fargo within the meaning of §20(a) of the 1934 Act.  By virtue of his position as Chairman of the Board and CEO of the Company and his ownership of more than 5 million shares of Wells Fargo stock and option, Stumpf

1  had the power and authority to cause Wells Fargo to engage in the wrongful conduct complained of

2  herein.  Wells Fargo in turn controlled each of the Individual Defendants and all of its employees.

3  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

5      WHEREFORE, plaintiff prays for relief and judgment, as follows:

6      A.      Determining that this action is a proper class action, designating plaintiff as Lead

7  Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

8  Procedure and plaintiff's counsel as Lead Counsel;

9      B.      Awarding plaintiff and the members of the Class damages, including interest;

10     C.      Awarding plaintiff's reasonable costs and expenses incurred in this action, including

11 counsel fees and expert fees; and

12     D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the

13 Court, including a constructive trust over all performance-based compensation and equity grants

14 received during the Class Period by the Individual Defendants that were in whole or in part derived

15 from or associated with the misconduct detailed herein.

### JURY DEMAND

17     Plaintiff demands trial by jury.

18 DATED:  September 26, 2016                  ROBBINS GELLER RUDMAN
                                                & DOWD LLP
19                                           SHAWN A. WILLIAMS
                                             AELISH M. BAIG
20                                           JASON C. DAVIS

21

22                                                  s/Shawn A. Williams
                                             SHAWN A. WILLIAMS

23                                           Post Montgomery Center
                                             One Montgomery Street, Suite 1800
24                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
25                                           415/288-4534 (fax)

26

27                                           Attorneys for Plaintiff

28 I:\Admin\CptDraft\Securities\CPT Wells Fargo .docx

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                            - 36 -

DocuSign Envelope ID: CB180173-BA74-4A7D-8AAB-DD113C4D9E85

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Gary Hefler, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.   I have reviewed the complaint and authorize its filing.

2.   I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.   I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.   I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 9/23/14 | 25 | 52.9873 |
| 9/24/14 | 150 | 52.15 |
| 10/13/14 | 100 | 50.71 |
| 7/7/15 | 100 | 55.3485 |
| 10/13/15 | 100 | 51.84 |
| 1/6/16 | 175 | 51.99 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |

DocuSign Envelope ID: CB180173-BA74-4A7D-8AAB-DD113C4D9E85
September 23, 2016
Page 2

     5.     I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

     6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

     Executed this 23rd day of September, 2016.

DocuSigned by:

*Gary Pfeffer*

Gary Pfeffer