UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY HEFLER, et al., | Case No. 16-cv-05479-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES** |
| WELLS FARGO & COMPANY, et al., | |
| Defendants. | Re: ECF Nos. 238, 239 |

Before the Court are Lead Plaintiff's motion for final approval of a class action settlement and plan of allocation and Plaintiff's Counsel's[1] motion for an award of attorneys' fees and litigation expenses. ECF Nos. 238, 239. The Court previously granted a motion for preliminary approval of the settlement, ECF No. 234, and held a fairness hearing on December 18, 2018. The Court will grant the motions.

## I. BACKGROUND

### A. The Parties and Claims

Plaintiffs bring this federal securities class action against Wells Fargo & Company and several of its officers and directors for violations of sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5. *See* ECF No. 207.

Lead Plaintiff Union Asset Management Holding, AG ("Union") brings these claims "on behalf of all persons who purchased Wells Fargo common stock between February 26, 2014 and

---

[1] Because Class Counsel seeks this award on behalf of the counsel for all class representatives as well, *see* ECF No. 239 at 9, the Court refers to the proposed fees recipients collectively as "Plaintiffs' Counsel," except where referring to individual firms.

September 20, 2016, inclusive (the 'Class Period')." ECF No. 207 ¶ 2.

The substance of Union's claims is set forth in greater detail in the Court's prior order granting in part and denying in part Defendants' motions to dismiss. *See* ECF No. 205. In short, Union alleges that Defendants made "repeated misrepresentations and omissions about a core element of Wells Fargo's business: its acclaimed 'cross-selling' business model," ECF No. 207 ¶ 3, artificially inflating Wells Fargo's stock price, *id.* ¶ 261. Union seeks damages related to this inflation of Wells Fargo's stock price and its subsequent decline when the truth about Wells Fargo's practices came to light through a series of disclosures in September 2016. *See, e.g.*, *id.* ¶¶ 262, 270.

**B.     Procedural Background**

Plaintiff Gary Hefler filed the initial complaint in this action on September 26, 2016. ECF No. 1. Several related lawsuits based on the same misconduct were subsequently filed against Wells Fargo. ECF Nos. 8, 12, 14, 18, 47, 55, 222. On January 5, 2017, the Court granted Union's motion to consolidate *Hefler v. Wells Fargo & Co.*, Case No. 16-cv-5479, with *Klein v. Wells Fargo & Co.*, Case No. 16-cv-5513, and to appoint Union as Lead Plaintiff, Motley Rice LLC as Lead Counsel, and Robbins Geller Rudman & Dowd LLP as Liaison Counsel. ECF No. 58. The Court later granted Union's motion to substitute Bernstein Litowitz Berger & Grossman LLP ("BLB&G") as Lead Counsel. ECF No. 95.

Wells Fargo and the Individual Defendants filed a set of eight motions to dismiss, which the Court granted in part and denied in part on February 27, 2018. *See* ECF No. 205. Shortly thereafter, Union filed the operative second amended class action complaint. ECF No. 207.

On July 31, 2018, Union filed an unopposed motion to certify a settlement class and for preliminary approval of a settlement. ECF No. 225. On September 4, 2018, the Court granted the motion for preliminary approval, conditionally certified the class, and appointed BLB&G as Class Counsel. ECF No. 234. Union has now filed a motion for final approval of the class action settlement and the plan of allocation and Class Counsel has filed a motion for an award of attorneys' fees and litigation expenses. ECF Nos. 238, 239. The Court held a fairness hearing on December 18, 2018.

C.      **Terms of the Agreement**

The proposed settlement agreement ("Settlement") resolves claims between Wells Fargo

and the class, which the Court conditionally certified as follows:

> [A]ll persons and entities who purchased Wells Fargo common stock
> from February 26, 2014 through September 20, 2016, inclusive.
> Excluded from the Settlement Class are: (i) Defendants; (ii)
> Immediate Family Members of any Individual Defendant; (iii) any
> person who was a director or member of the Operating Committee of
> Wells Fargo during the Class Period and their Immediate Family
> Members; (iv) any parent, subsidiary or affiliate of Wells Fargo; (v)
> any firm, trust, corporation, or other entity in which Defendants or
> any other excluded person or entity has, or had during the Class
> Period, a controlling interest; and (vi) the legal representatives,
> agents, affiliates, heirs, successors-in-interest or assigns of any such
> excluded persons or entities. Notwithstanding the foregoing
> exclusions, no Investment Vehicle shall be excluded from the
> Settlement Class. Also excluded from the Settlement Class are any
> persons and entities who or which exclude themselves by submitting
> a request for exclusion that is accepted by the Court.

ECF No. 234 at 2-3; *see also id.* at 6-7.

Under the Settlement, Wells Fargo has paid $480 million dollars (the "Settlement

Amount") into the Settlement Fund.  ECF No. 225-1 at 13, 17; *see also* ECF No. 240 ¶ 102.  The

following amounts will be subtracted from the Settlement Amount: (1) taxes; (2) notice costs; and

(3) attorneys' fees and expenses.  ECF No. 225-1 at 17; ECF No. 225 at 33.[2]

Pursuant to the proposed plan of allocation, class members who submit timely claims will

receive payments on a pro rata basis based on the date(s) class members purchased and sold Wells

Fargo common stock, as well as the total number and amount of claims filed.  ECF No. 225-1 at

75–78.  To calculate the amount that will be paid to each class member, the Claims Administrator[3]

will determine each claim's share of the Settlement Fund proceeds based upon the claimant's

recognized loss.  *Id.* at 75–76.  The recognized loss calculation will be "based primarily on the

difference in the amount of alleged artificial inflation in the prices of Wells Fargo common stock

at the time of purchase and at the time of sale or the difference between the actual purchase price

---

[2] Although the Settlement indicates that it may be used to pay service awards to named Plaintiffs, they no longer seek a service award.  *See* ECF No. 240 ¶ 243.
[3] The Court approved Union's selection of Epiq Class Action & Mass Tort Solutions as the Claims Administrator.  ECF No. 234 at 18-19; *see also* ECF No. 225 at 30.

3

and the sale price." *Id.* at 75. Before deducting any costs or attorneys' fees, the Settlement represents an average recovery of $0.44 per eligible share. *Id.* at 62. After deductions, the recovery will be approximately $0.35 per share. *See id.* at 64 ("The estimated average cost per affected share of Wells Fargo common stock, if the Court approves Lead Counsel's fee and expense application, is $0.09 per share."). No distribution will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00; instead, those funds will be included in the distribution to other Authorized Claimants. *Id.* at 78. Nine months after the initial distribution, the Claims Administrator will make additional re-distributions to class members if it is cost effective to do so. *Id.* Any Settlement Funds not distributed to the class will be paid to a cy pres recipient: the Investor Protection Trust. *Id.*

In exchange for the settlement payment, Plaintiffs agree to release the following:

> [A]ny and all claims, debts, demands, rights or causes of action or liabilities of every nature and description (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses or liability whatsoever), whether known claims or Unknown Claims, whether arising under federal, state, local, foreign, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or un-accrued, liquidated or unliquidated, at law or in equity, matured or unmatured, whether class or individual in nature, that both (i) concern, arise out of, relate to, or are based upon the purchase, acquisition, or ownership of Wells Fargo common stock during the Class Period and (ii) were asserted or could have been asserted in this Action by Lead Plaintiff or any other member of the Settlement Class against any of the Defendants' Releasees that arise out of, relate to, or are based upon any of the allegations, circumstances, events, transactions, facts, matters, occurrences, statements, representations or omissions involved, set forth, or referred to in the Complaint, except for claims relating to the enforcement of the Settlement.

*Id.* at 12. The Settlement does not, however, cover "the claims asserted in any derivative or ERISA action against any of the Defendants." *Id.* at 12–13.

Wells Fargo reserves the right to terminate the Settlement "in the event that Settlement Class Members timely and validly requesting exclusion from the Settlement Class meet the conditions set forth in Wells Fargo's confidential supplemental agreement with Lead Plaintiff."

ECF No. 225-1 at 28.[4]

## II.     FINAL APPROVAL OF SETTLEMENT AGREEMENT

### A.     Legal Standard

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).

In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* at 1026. Under Ninth Circuit precedent, the district court must balance a number of factors in this analysis:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). Recent amendments to Rule 23 require the district court to consider a similar list of factors, namely, whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

---

[4] The Court granted Union's motion to file the confidential supplemental agreement under seal in connection with preliminary approval of the settlement. ECF No. 234 at 9-11.

Fed. R. Civ. P. 23(e)(2).[5]  In the notes accompanying these amendments, the Advisory Committee acknowledged that "[c]ourts have generated lists of factors" to determine the fairness, reasonableness, and adequacy of a settlement, and that "each circuit has developed its own vocabulary for expressing these concerns."  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.   The Advisory Committee notes explain that adding these specific factors to Rule 23(e)(2) was not designed "to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  *Id.*; *see also United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002) ("[T]he Advisory Committee Notes provide a reliable source of insight into the meaning of a rule . . . .").  Accordingly, the Court applies the framework set forth in Rule 23, while continuing to draw guidance from the Ninth Circuit's factors and relevant precedent.  The Court bears in mind, moreover, the Advisory Committee's instruction not to let "[t]he sheer number of factors . . . distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

Settlements that occur before formal class certification also require a higher standard of fairness.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  In reviewing such settlements, in addition to considering the above factors, the court also must ensure that "the settlement is not the product of collusion among the negotiating parties."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011).

**B.      Class Action Fairness Act Compliance**

This action is subject to the requirements of the Class Action Fairness Act of 2005 ("CAFA"), which requires that, within ten days of the filing of a proposed settlement, each

---

[5] After promulgating the amendments, the Supreme Court transmitted them to Congress with the instruction that the amendments "shall take effect on December 1, 2018, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."  Order Submitting Amendments to Federal Rules of Civil Procedure at 3 (April 26, 2018), https://www.supremecourt.gov/orders/courtorders/frcv18_5924.pdf; *see generally*, *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1050 (9th Cir. 2018) (describing amendment process).  The Court finds it is just and practicable to apply the new Rule to this proceeding, particularly because Union has addressed the new Rule in its briefing on this motion. *See* ECF No. 238 at 24-27.

defendant serve a notice containing certain required information upon the appropriate State and Federal officials. 28 U.S.C. § 1715(b). Defendants have provided evidence that they complied with this requirement on August 10, 2018, ten days after the motion for preliminary approval was filed. *See* ECF No. 235.

CAFA also prohibits a court from granting final approval until ninety days have elapsed since notice was served under § 1715(b). 28 U.S.C. § 1715(d). This requirement has also been satisfied.

### C.    Analysis

#### 1.    Adequacy of Notice

"The class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

The Court has previously approved the parties' proposed notice procedures. ECF No. 234 at 19. In the motion for final approval, Union states that the parties have since carried out this notice plan. ECF No. 238 at 23. Epiq, the Claims Administrator, mailed 1,866,302 Notice Packets to potential class members, including various institutions that requested copies to forward to stock holders. ECF No. 240-3 at 4 ¶ 8. The Notice informed class members about all key aspects of the Settlement, the date, time, and place of the fairness hearing, and the process for objections. *Id.* at 9-23. 9,416 Notice Packets were returned as undeliverable. *Id.* at 4-5 ¶ 8. Epiq obtained forwarding addresses from the post office for 2,637 of the class members and mailed each a second Notice Packet. *Id.*

In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and the *Los Angeles Times*, as well as transmitted over the *PR Newswire* on October 9, 2018. *Id.* at 5 ¶ 9. As required by the Preliminary Approval Order, Epiq also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.WellsFargoSecuritiesLitigation.com, to provide class members with information concerning the Settlement, as well as downloadable copies of the Notice Packet, Settlement, and Preliminary Approval Order. *Id.* at 5 ¶ 13. Finally, Epiq maintains a toll-free number that class members can

call for further information; the number is provided in the Notice Packet, Summary Notice, and on the Website. *Id.* at 5 ¶¶ 10-12.

The deadline for class members to submit objections to the Settlement, the Plan of Allocation, or the Fees and Expenses Motion, or to request exclusion from the Settlement Class, was November 27, 2018. *Id.* at 6 ¶ 14. In its reply brief, Union states that 9 objections and 253 requests for exclusion[6] have been received. ECF No. 249 at 6 & nn. 2-3.

In light of these actions, and the Court's prior order granting preliminary approval, the Court finds the parties have sufficiently provided notice to the settlement class members. *See Lundell v. Dell, Inc.*, Case No. 05–3970 JWRS, 2006 WL 3507938, at *1 (N.D. Cal. Dec. 5, 2006) (holding that notice sent via email and first class mail constituted the "best practicable notice" and satisfied due process requirements).

### 2. Fairness, Adequacy, and Reasonableness

#### a. Procedural Concerns

The Court must consider whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B). As the Advisory Committee notes suggest, these are "matters that might be described as 'procedural' concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory committee's note to 2018 amendment. These concerns implicate factors such as the non-collusive nature of the negotiations, as well as the extent of discovery completed and stage of the proceedings. *See Hanlon*, 150 F.3d at 1026.

#### i. Adequate Representation of the Class

The Ninth Circuit has explained that "adequacy of representation . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 462.

---

[6] 15 of those requests for exclusion were received after the November 27, 2018 deadline. ECF No. 249 at 6 n.3. Union asks the Court to exclude those class members as well. *Id.*

8

In its Preliminary Approval Order, the Court found that there was no evidence of a conflict between either class representatives or Class Counsel and the rest of the class. ECF No. 234 at 5. No contrary evidence has emerged.

Similarly, the Court found that Class Counsel had vigorously prosecuted this action through dispositive motion practice, extensive initial discovery, and formal mediation. *Id.* at 7, 15. The Court further found that, given this prosecution of the action, counsel "possessed 'sufficient information to make an informed decision about settlement.'" *Id.* at 15 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459). Moreover, counsel's preliminary approval motion included information regarding the settlement outcomes of similar cases, further indicating that counsel "had an adequate information base" when negotiating the settlement. Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory committee's note to 2018 amendment. The Court finds that Class Counsel have continued to represent the class's interest by diligently complying with the notice plan and other settlement procedures.

For its part, Union actively participated in the prosecution of this case, including reviewing filings and discovery, and attending and participating in settlement negotiations. ECF No. 240-2 ¶¶ 8-12.

Accordingly, the Court concludes that this factor weighs in favor of approval.

### ii.    Arm's Length Negotiations

Here, the Settlement was the product of arm's length negotiations through two full-day mediation sessions and multiple follow-up calls supervised by former U.S. District Judge Layn Phillips. *See* ECF No. 240-1 ¶¶ 7-14.

Moreover, pursuant to Ninth Circuit precedent, the Court must examine the Settlement for additional indicia of collusion that would undermine seemingly arm's length negotiations. Because the Settlement was reached prior to class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement," and the Court must examine the risk of collusion with "an even higher level of scrutiny for evidence of collusion or other conflicts of interest." *In re Bluetooth*, 654 F.3d at 946. Signs of collusion include: (1) a disproportionate distribution of the settlement fund to counsel; (2) negotiation of a "clear sailing provision"; and (3)

an arrangement for funds not awarded to revert to defendant rather than to be added to the settlement fund. *Id.* at 947. If "multiple indicia of possible implicit collusion" are present, a district court has a "special 'obligat[ion] to assure itself that the fees awarded in the agreement were not unreasonably high.'" *Id.* (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)).

The Court previously found no signs of collusion because Class Counsel's intended fee request was presumptively proportionate to the settlement fund, there was no clear sailing provision, and no funds would revert to Defendants. ECF No. 234 at 13-14. These findings remain applicable. Further, as discussed in greater detail when evaluating the fees motion, the Court finds that the requested fees are in fact reasonable.

The Court therefore concludes that this factor weighs in favor of approval.

### b. Substantive Concerns

Rule 23(e)(2)(C) and (D) set forth factors for conducting "a 'substantive' review of the terms of the proposed settlement." Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to 2018 amendment. In determining whether "the relief provided for the class is adequate," the Court must consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C). In addition, the Court must consider whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

### i. Strength of Plaintiffs' Case and Risk of Continuing Litigation

Consistent with Rule 23's instruction to consider "the costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), courts in this circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial," *Hanlon*, 150 F.3d at 1026.

In its prior order, the Court found that Plaintiffs faced significant obstacles in surviving

10

summary judgment and ultimately prevailing at trial. ECF No. 234 at 14. As set forth in Union's motion, these obstacles include inherent difficulties in proving scienter and loss causation, as well as overcoming a "truth-on-the-market" defense that could have eliminated any recovery. ECF No. 238 at 17-18. In addition to this uncertainty, the Court found that any relief to class members obtained through trial and possible appeals would be substantially delayed. ECF No. 234 at 14-15.

The Court continues to find that this factor weighs in favor of approval.

### ii. Effectiveness of Distribution Method, Terms of Attorneys' Fees, and Supplemental Agreements

The Court must consider "the effectiveness of [the] proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). As explained below, the Court concludes that the plan of allocation, which is based on the relative size of claims compromised, is reasonable. The Court further finds that the proposed claims process provides an effective method of implementing that plan by ensuring that the claimant provides sufficient information to calculate the recognized loss amount. Therefore, this factor weighs in favor of approval.

The Court evaluates in detail "the terms of [the] proposed award of attorney's fees," Fed. R. Civ. P. 23(e)(2)(C)(iii), in connection with Class counsel's motion for fees and costs. In short, this factor also weighs in favor of approval.

The only supplemental "agreement identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(C)(iv), permits Wells Fargo to terminate the Settlement if a certain percentage of the class requests exclusion. ECF No. 234 at 9; ECF No. 225-1 at 28. The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015). The Court previously reviewed the supplemental agreement under seal and concluded that the termination provision is fair and reasonable. ECF No. 234 at 17. The Court concludes that the agreement does not weigh against approval.

### iii. Equitable Treatment of Class Members

Consistent with Rule 23's instruction to consider whether "the proposal treats class

members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(C)(i), the Court considers whether the Settlement "improperly grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

Under the Settlement, class members who submit timely claims will receive payments on a pro rata basis based on the date(s) class members purchased and sold Wells Fargo shares as well as the total number and amount of claims filed. ECF No. 225-1 at 75-78. In granting preliminary approval, the Court found that this allocation did not constitute improper preferential treatment. ECF No. 234 at 16. As explained in greater detail below, the Court adheres to its view that the allocation plan is equitable.

In its motion for preliminary approval, Union indicated that it intended to seek service awards on behalf of Named Plaintiffs. *See* ECF No. 234 at 16. Although such awards are permissible, *see, e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009), Union now indicates that it will not seek any additional service award, *see* ECF No. 240 ¶ 243.

The Court therefore concludes that this factor weighs in favor of approval.

### iv. Settlement Amount

Although not articulated as a separate factor in Rule 23(e), "[t]he relief that the settlement is expected to provide to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to 2018 amendment. The Court therefore examines "the amount offered in settlement." *Hanlon*, 150 F.3d at 1026.

To evaluate the adequacy of the settlement amount, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware*, 484 F. Supp. 2d at 1080. But "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628.

Here, the $480 million fund achieves a good result for the class. Union's expert calculates that the maximum potential damages the class could have won at trial ranged from $353.1 million to $3.063 billion, depending on which "corrective disclosures were accepted as demonstrating loss

12

causation." ECF No. 225-2 ¶ 34. Even accepting the high estimate that the class is settling claims worth $3.063 billion, the Settlement provides the class with a greater than 15 percent recovery. *Id.* ¶ 36. This recovery is higher than recoveries achieved in other securities fraud class actions of similar size (over $1 billion in estimated damages), which settled for median recoveries of 2.5 percent between 2008 and 2016, and 3 percent in 2017. *Id.* (citing Cornerstone Research, Securities Class Action Settlements, 2017 Review and Analysis, at 8 (2018)).[7] Accordingly, the amount of the Settlement also weighs in favor of approval.

### v. Counsel's Experience

The Court also considers "the experience and views of counsel." *Hanlon*, 150 F.3d at 1026. That counsel advocate in favor of this Settlement weighs in favor of its approval.[8]

### c. Reaction of the Class

Finally, the Court considers the class's reaction to the Settlement. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision*, 559 F. Supp. 2d at 1043 (citation omitted).

In this case, the Court received and filed correspondence from nine class members. *See* ECF Nos. 237, 241, 242, 243, 244, 245, 246, 247, 248.[9] In addition, Class Counsel provided the Court with an email from a putative class member. ECF No. 250-1.

These ten letters are properly construed as objections. Although the precise number of potential class members is unclear, the Claims Administrator mailed out more than 1.8 million Notice Packets to potential class members. ECF No. 240-3 at 4 ¶ 8. Even assuming some

---

[7] Neither Union's percentage calculations for this action nor the calculation of comparison cases appears to exclude attorneys' fees paid from the common fund. But even subtracting Class counsel's fees and costs, *see* Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to 2018 amendment, the Class's recovery of roughly $384 million (or 12.5 percent) still far outstrips comparable securities class actions.

[8] The Court considers this factor, as it must, but gives it little weight. "[A]lthough a court might give weight to the fact that counsel for the class or the defendant favors the settlement, the court should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less than a strong, favorable endorsement." *Principles of the Law of Aggregate Litigation* § 3.05 cmt. a (Am. Law. Inst. 2010).

[9] The Court considers all of these letters even though four – ECF Nos. 245, 246, 247, 248 – were filed after the November 27, 2018 deadline to file objections. *See* ECF No. 240-3 at 21.

United States District Court
Northern District of California

duplication, 10 objections represents a minute fraction of the potential class, as does the 253

requests for exclusion. *See* ECF No. 249 at 6 & n.3. Moreover, the objectors have alleged

ownership of a combined 452 shares, as compared to 1.1 billion shares affected. *See id.* at 6. This

overwhelmingly positive response supports approval. *See Rodriguez*, 563 F.3d at 967 (54

objections out of roughly 376,000 putative class members); *Churchill Vill.*, 361 F.3d at 577 (45

objections and 500 opt-outs from approximately 90,000 class members); *In re Omnivision Techs.,*

*Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009) (3 objections out of approximately 57,000 class

members). Further, no institutional investor submitted an objection or requested exclusion,

although institutional investors held between 80.9 to 92.1 percent of outstanding shares of Wells

Fargo common stock throughout the Class Period. ECF No. 250 ¶ 3. Under these circumstances,

"[t]hat not one sophisticated institutional investor objected to the Proposed Settlement is indicia of

its fairness." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2018 WL

6168013, at *9 (S.D.N.Y. Nov. 26, 2018); *see also In re Linerboard Antitrust Litig.*, 321 F. Supp.

2d 619, 629 (E.D. Pa. 2004).

Turning to the specific objections, the Court observes as a preliminary matter that five of

the objectors do not indicate that they are members of the class. *See* ECF Nos. 237, 241, 242, 245,

250-1; *cf.* ECF No. 240-3 at 21 (instructing objectors to state "the basis for your belief that you are

a member of the settlement class"). The Court could reject their objections on this basis, but

nonetheless finds that they lack merit as well. *See Perkins v. Linkedin Corp.*, No. 13-CV-04303-

LHK, 2016 WL 613255, at *3 (N.D. Cal. Feb. 16, 2016).

The Court construes[10] six of the objections as expressing dissatisfaction with this lawsuit

or securities lawsuits in general, including suggestions that suing Wells Fargo would actually

harm shareholders. ECF Nos. 237, 241, 242, 245, 246, 250-1. Objections that a "case should

never have been brought" and advocating "no recovery for the Class" are contrary to the interests

---

[10] Many of the objections failed to "state with specificity the grounds for the objection." Fed. R. Civ. P. 23(e)(5)(A). Nonetheless, the Court "take[s] care . . . to avoid unduly burdening class members who wish to object" by "recogniz[ing] that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards." Fed. R. Civ. P. 23(e)(5)(A) advisory committee's note to 2018 amendment.

United States District Court
Northern District of California

of the class and are therefore not a basis for finding a settlement unreasonable. *Perkins*, 2016 WL 613255, at \*4. The Court therefore overrules these objections.

One objection contended that Wells Fargo should pay the full amount of damages and attorneys' fees. ECF No. 244. Another objection contended that the Settlement Amount was inadequate because each class member's loss amount will be determined by the lower of various metrics. ECF No. 245 at 1.[11] As an initial matter, the loss amount goes to determining each class member's pro rata share, but does not affect the total Settlement Amount, i.e., the class's recovery. *See* ECF No. 225-1 at 21. Thus, contrary to the objection, choosing the lesser of or the greater of those metrics does not reflect a lack of zealous advocacy on the part of Class Counsel. Moreover, as Union points out, this provision parallels the relevant damage provisions of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(e). And finally, for the reasons stated above, the Court finds that the amount of the class's recovery is reasonable under the Settlement. Thus, these objections are overruled.

Two objectors argued that they should not have to spend their own resources to opt out of the class or file objections. ECF Nos. 241, 242. These costs are an inherent feature of opt-out class actions, which are authorized by the Federal Rules. Moreover, the Court finds that the Notice Plan did not make it unduly difficult for class members to exercise their rights to request exclusion or object.

Two objectors argued that they received inadequate notice prior to the November 27, 2018 deadline. The first objector received notice in late October. ECF No. 245 at 1. Epiq has no record of mailing a Notice Packet to the objector, suggesting that he received one from "a nominee who requested Notice Packets from Epiq in bulk to forward to its clients." ECF No. 250-10 ¶ 3(a). The second objector received notice on November 14, 2018. ECF No. 247 ¶ 3. Epiq received the objector's information from Fidelity Investments on October 16, 2018, and mailed a Notice Packet on October 22, 2018. ECF No. 250-10 ¶ 3(b). Where "brokerages, banks and institutions [hold]

---

[11] For instance, for shares held at the end of the Class Period, the loss amount "will be *the lesser of*: (1) the amount of artificial inflation per share on the date of purchase as stated in Table A; or (ii) the purchase price *minus* \$48.96." ECF No. 240-3 at 19.

15

shares in their street names for the beneficial owners," delays in dissemination of class notice may result. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993). Nonetheless, adequacy of notice does not turn on "whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement." *Id.* at 1375; *see also Silber v. Mabon*, 18 F.3d 1449, 1452-54 (9th Cir. 1994) (finding that best notice practicable had been given even though individual shareholder did not receive notice from nominee until after opt-out deadline). Indeed, in both *Torrisi* and *Silber*, the objectors did not receive notice until after the deadline to object or opt-out. *See Silber*, 18 F.3d at 1454; *Torrisi*, 8 F.3d at 1374. Here, both objectors received notice between two to four weeks before the deadline and the Court has considered the merits of their objections. Although these pro se objectors' desire for more time is understandable, it does not mean that notice to the class was inadequate.

One objector contended that the class should have been certified earlier in the litigation. ECF No. 247 ¶ 4. "Litigation takes time." *Orange Cty. Water Dist. v. Unocal Corp.*, No. SACV0301742CJCANX, 2016 WL 11201024, at *13 (C.D. Cal. Nov. 3, 2016). It is not surprising that litigation of this scale over sums of this magnitude took a period of many months to resolve. In any event, this fact does not bear on the reasonableness of the Settlement.

That same objector argued that the Settlement should have included holders of Wells Fargo preferred stock. ECF No. 247 ¶ 6. Plaintiffs have never asserted claims on behalf of preferred shareholders and those claims are not released by the Settlement. *See* ECF No. 207 ¶ 2; ECF No. 225-1 at 12-13. This objection is thus largely immaterial. To the extent it is relevant to the adequacy of representation of the class, courts have generally rejected objections challenging lead plaintiffs' decisions not to bring certain claims in securities class actions. *See N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 239 (E.D. Mich. 2016) (rejecting objection because "the Settlement does not preclude warrant holders from bringing their own lawsuit and claims seeking recovery against GM" and "the decision whether to include GM warrant holders in this litigation fell within NYSTRS' discretion as lead plaintiff"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, No. 12-CV-4081, 2013 WL 4399215, at *3

(S.D.N.Y. Aug. 13, 2013) (observing that courts "have consistently held that a lead plaintiff has the sole authority to determine what claims to pursue on behalf of the class").[12]

Two objections argued that the Settlement's de minimis provision was unreasonable because class members with less than $10.00 in claims do not receive a distribution. *See* ECF No. 245 at 1; ECF No. 248 at 3-7; *see also* ECF No. 225-1 at 78. A $10 threshold, however, is "standard in securities class actions and benefit[s] the Settlement Class as a whole because [it] reduce[s] the costs associated with printing and mailing checks for de minimis amounts, as well as costly follow-up to ensure those checks have been received and cashed." *N.Y. State Teachers' Ret. Sys.*, 315 F.R.D. at 241; *see also In re MGM Mirage Sec. Litig.*, 708 F. App'x 894, 897 (9th Cir. 2017) (collecting cases and noting that "numerous cases that have approved similar or higher minimum thresholds" than $10).[13]

One objection disagreed with the chosen cy pres beneficiary, the Investor Protection Trust. ECF No. 248 at 7. As Union notes, a cy pres distribution will be made only after an initial 100 percent distribution to the class and subsequent rounds of re-distribution until the amount "of uncashed or returned checks is sufficiently small that a further re-distribution to claimants would not be cost-effective." ECF No. 249 at 17 (citing ECF No. 240-3 at 20). Moreover, the Court concludes that the Investor Protection Trust's mission of educating investors makes it an appropriate cy pres beneficiary. *See In Re: Volkswagen "Clean Diesel" Mktg., Sales Practices, And Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2018 WL 6198311, at *5 (N.D. Cal. Nov. 28, 2018) (finding the Trust an appropriate cy pres beneficiary because "[a] savvy, educated investor is hopefully more likely to identify signs of securities fraud, which furthers the Exchange Act's purpose of maintaining "fair and honest markets" (quoting 15 U.S.C. § 78b)). As to the objector's proposal that claimants vote on their preferred beneficiaries, ECF No. 248 at 9, the Court

---

[12] The credibility of this objector's claim is also undermined by the fact that he attempted to solicit a $1 million payment from Class counsel to withdraw his objection. *See* ECF No. 250-11 ¶ 3. The Advisory Committee specifically remarked on this predatory practice and amended Rule 23 to provide additional safeguards: "But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process." Fed. R. Civ. P. 23(e)(5)(B) advisory committee's note to 2018 amendment.
[13] Pursuant to Ninth Circuit Rule 36-3, *In re MGM* is not precedential. Nevertheless, the Court relies upon it as persuasive authority.

concludes that the administrative costs of implementing that system at this stage of the litigation would outweigh any putative benefits to the class.

For the foregoing reasons, the Court overrules the above objections. Objectors also raised concerns regarding the proposed attorneys' fees. The Court considers those objections in connection with that motion.

Balancing the relevant factors, the Court finds the Settlement fair and reasonable.

## III. FINAL APPROVAL OF PLAN OF ALLOCATION

### A. Legal Standard

"Approval of a plan of allocation of settlement proceeds in a class action . . . is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.*, No. C–90–0931–VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 16, 1994) (citing *Class Pls. v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)).

### B. Analysis

The allocation plan for the Settlement tailors the recovery of each class member to the timing of any sales or purchases of Wells Fargo common stock relative to periods of alleged artificial inflation and corrective disclosures, as well as the number of shares involved with each class member's claim. *See* ECF No. 225 at 28. In other words, the allocation plan disburses the Settlement Fund to class members "on a *pro rata* basis based on the relative size of" the potential claims that they are compromising. *Id.* This type of pro rata distribution has frequently been determined to be fair, adequate, and reasonable. *See, e.g.*, *Thomas v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2017 WL 4750628, at *8 (N.D. Cal. Oct. 20, 2017); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *4 (N.D. Cal. Apr. 3, 2013) (approving similar plan of distribution); *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members, have repeatedly been deemed fair and reasonable."). The Court concludes that this plan, which does not

discriminate between class members, is fair and reasonable.[14]

## IV. ATTORNEYS' FEES

### A. Legal Standard

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. Courts have discretion to "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* at 942.

For more than two decades, the Ninth Circuit has set the "benchmark for an attorneys' fee award in a successful class action [at] twenty-five percent of the entire common fund." *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). Courts in the Ninth Circuit generally start with the 25 percent benchmark and adjust upward or downward depending on:

> the extent to which class counsel "achieved exceptional results for the class," whether the case was risky for class counsel, whether counsel's performance "generated benefits beyond the cash . . . fund," the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954-55 (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002)).

Courts often also cross-check the amount of fees against the lodestar. "Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050.

### B. Analysis

Plaintiffs' Counsel move the Court for 20 percent of the overall $480 million Settlement Amount. ECF No. 239 at 9. This represents an award of approximately $95.9 million in

---

[14] The Court GRANTS Union's request to strike the portion of the plan of allocation that imposes restrictions on how an ERISA Plan claimant may distribute funds to its own beneficiaries, given the potential conflict with applicable law. *See* ECF No. 238 at 29.

attorneys' fees. ECF No. 239 at 19.[15]  Plaintiffs' Counsel argue that the award is reasonable because counsel achieved an excellent recovery, faced substantial litigation risks, displayed a high level of skill and professionalism, and pursued the litigation on a contingent basis. *Id.* at 24-29.

### 1.    Benchmark Analysis

After careful review of Plaintiffs' Counsel's declarations and filings, the Court concludes that awarding $95.9 million in attorneys' fees is reasonable.  Because the 20 percent award requested is below the "benchmark" percentage for a reasonable fee award in the Ninth Circuit, it is "presumptively reasonable." *Ching v. Siemens Industry, Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *7 (N.D. Cal. June 27, 2014) (quoting *In re Bluetooth*, 654 F.3d at 942).  In addition, it is within the median range of 19-22.3 percent in fees awarded in cases with large settlements over $100 million. *See Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018).  Plaintiffs' Counsel also provide a report on securities fraud class action settlements, which reveals a similar range.  The report documents a median attorneys' fee of 22 percent in settlements of $100-500 million and 17 percent in settlements of $500 million-$1 billion, consistent during the periods from 1996 to 2011 and from 2012 to 2017.  NERA Economic Consulting, *Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review* at 42 (2018), ECF No. 240-11 at 45.

In addition, the other relevant factors do not support a downward adjustment.  The Court considers the results achieved; the level of risk; and the burdens on class counsel.  The first and "most critical factor [in determining an attorneys' fee] is the degree of success obtained."[16] *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  As noted above, Plaintiffs' Counsel obtained an excellent result for the class when compared to similar cases, despite comparable risks. *See In re Omnivision*, 559 F. Supp. 2d at 1046 (noting that a 9 percent recovery for the class was "more than triple the average recovery in securities class action settlements"); ECF No. 239 at 16 (collecting

---

[15] Counsel request that the 20 percent share be applied after subtracting any litigation expenses awarded.  ECF No. 239 at 9.

[16] As the Court has noted in the past, consideration of counsel's degree of success is at least partly subsumed by the percentage recovery method, under which "counsel's success provides its own reward." *Rodman*, 2018 WL 4030558, at *3 n.3.

cases).  Second, Plaintiffs' Counsel faced substantial risks in pursuing this litigation, given the inherent uncertainties of trying securities fraud cases and the demanding pleading standards of the PLSRA.  *Id.* at 1046; *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2018 WL 6168013, at *15 ("Courts have recognized that, in general, securities actions are highly complex and that securities class litigation is notably difficult and notoriously uncertain." (internal quotation marks and citations omitted)).  Given the litigation resources involved, any victory in this Court would almost certainly have had to be defended on appeal as well.  Third, although the two-plus year lifespan of this litigation is not as lengthy as some other cases, *see Rodman*, 2018 WL 4030558, at *3 (six years), Plaintiffs' Counsel bore a heavy financial burden in expending substantial resources – a claimed lodestar of over $29 million – on a contingency basis.  Each of these factors weighs in favor of the award.

### 2.      Lodestar Cross-Check

To confirm an award's reasonableness through a lodestar cross-check, a court takes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.  "[T]he determination of fees 'should not result in a second major litigation'" and "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437).  Rather, the Court seeks to "do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838. A district court must "exclude from this initial fee calculation hours that were not 'reasonably expended.'" *Hensley*, 461 U.S. at 434 (citation omitted).  Additionally, the reasonable hourly rate must be based on the "experience, skill, and reputation of the attorney requesting fees" as well as "the rate prevailing in the community for similar work performed by [comparable] attorneys. . . ." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986), *amended by* 808 F.2d 1373 (9th Cir. 1987).  To inform and assist the Court in making this assessment, "the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

Plaintiffs' Counsel's rates range from $650 to $1,250 for partners or senior counsel, from

$400 to $650 for associates, and from $245 to $350 for paralegals.[17] ECF No. 240-5 at 11-13; ECF No. 240-6 at 10; ECF No. 240-7 at 12; ECF No. 240-8 at 8. The blended hourly rate for all timekeepers is $406. For purposes of the lodestar cross-check, the Court finds that these rates are reasonable. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (finding reasonable rates of $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals, given blended hourly rate of $529).

Plaintiffs' Counsel have documented in detail the amount of hours spent on different tasks per month. The Court has some concerns about counsel's hours. For instance, BLB&G spent 1,192 hours preparing complaints and its substitution motion, and 1,535 hours opposing the motions to dismiss. ECF No. 240-5 at 88. Even given the complexity of this litigation and the eight concurrent motions to dismiss, these hours are excessive. More problematically, a disproportionate amount of this time was spent by senior partners with top-of-market billing rates. BLB&G partner Salvator Graziano – whose claimed rate is $995 per hour – billed 84.25 hours for "[p]reparation of complaints & substitution of BLB&G" and 197.75 hours for "[m]otion to dismiss." *Id.* at 70. Similarly, partner Gerald Silk billed 124 hours towards the complaints and the substitution motions at a rate of $995 per hour. *Id.* at 71. Partner Adam Wierzbowski devoted 307.5 hours to the motion to dismiss, at a rate of $750 per hour. *Id.*

Plaintiffs' Counsel's total lodestar of $29,504,271.25 results in a multiplier of 3.22. And even if the Court were to reduce the senior partner billing rates for drafting tasks to a more reasonable $500 per hour, or reduce by half the hours spent on complaint drafting and responding to motions to dismiss, the multiplier would still be less than four. Percentage awards in the range of one to four times the lodestar are typical in common fund cases. *See Vizcaino*, 290 F.3d at 1051 n.6 (citations omitted) (finding a range of 0.6 to 19.6 in a survey of 24 cases, with 83 percent

---

[17] The Court uses Plaintiffs' Counsel's current rather historic rates, which is a well established method of ensuring that "[a]ttorneys in common fund cases [are] compensated for any delay in payment." *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 609 (9th Cir. 1997)).

in the 1.0 to 4.0 range and 54 percent in the 1.5 to 3.0 range). Because Plaintiffs' Counsel's lodestar multiplier is within the range of reasonableness, it supports the requested award.

### 3. Reaction of the Class

As with the Settlement itself, the lack of objections from institutional investors "who presumably had the means, the motive, and the sophistication to raise objections" weighs in favor of approval. *In re Bisys Sec. Litig.*, No. 04 CIV. 3840(JSR), 2007 WL 2049726, at *1 (S.D.N.Y. July 16, 2007).

Five objectors generally asserted that Plaintiffs' Counsel's fees request was unreasonably high, but they provided no specific objections as reasons to reject the request. ECF Nos. 241, 242, 245, 246. These generalized objections do not provide a basis to contravene the Court's benchmark analysis and lodestar cross-check. *See Asghari v. Volkswagen Grp. of Am., Inc.*, No. CV1302529MMMVBKX, 2015 WL 12732462, at *30 (C.D. Cal. May 29, 2015) (overruling objections that "conclusorily assert that the fees are too high as compared to the benefits class members will receive"). Two of the objectors also requested that the Court appoint an independent expert to assess the fee request. ECF Nos. 241, 242. Given the above analysis, the Court declines to exercise its discretion to do so. *See Vizcaino*, 290 F.3d at 1051 n.7. Another one of the objectors contended that Plaintiffs' Counsel had provided inadequate documentation in support of their fee request, but he appears to have been mistakenly referring to the Notice Packet. ECF No. 247 ¶ 5 (citing "Notice ¶ 22"). Plaintiffs' Counsel have produced meticulous documentation in support of their motion.

One objection also contended that fees should be reduced because "the great bulk of the time in the case" was billed by staff attorneys rather than senior partners. ECF No. 248 at 10. Because the staff attorneys have lower billing rates, however, this results in a lower lodestar, which factors into the Court's cross-check. The objector also expressed dissatisfaction with effectively applying a multiplier to time spent by paralegals and other support personnel. *Id.* To the extent that the objector – who is represented by counsel – contends that paralegals' work, unlike that of senior partners, is not worthy of a multiplier in meritorious cases, the Court disagrees with the premise of the argument and is not aware of any authority to support it.

23

1    The objector further contended that Plaintiffs' Counsel's hours were duplicative because

2    the same documents were produced in a related case. *Id.* at 10-11 (citing *In re Wells Fargo &*

3    *Company Shareholder Derivative Litigation*, No. 16-cv-05541-JST (N.D. Cal.)). The derivative

4    litigation is still ongoing. Even assuming that counsel requested the same documents in both

5    cases, the appropriate remedy would be to preclude double recovery in the derivative litigation,

6    not to withhold compensation in this case.

7    The objector argued that Plaintiffs' Counsel faced less substantial risk because of the

8    government enforcement action against Wells Fargo. ECF No. 248 at 11. But the government's

9    investigation and enforcement action concerned Wells Fargo's underlying fraudulent consumer

10   practices. It was not addressed to fraud on investors, and it did not reduce the costs or risks of

11   litigating this securities fraud case or help establish elements of the securities claims such as

12   materiality, scienter, or loss causation.

13   Finally, an objector argued that Union's 20 percent fee agreement with Class Counsel was

14   unreasonable, citing another litigation where Class Counsel purportedly agreed to a fee scale that

15   would have produced an 8.5% fee. ECF No. 243 at 2-3. While plaintiffs and counsel may

16   negotiate for such graduated fee scales, Union was not required to do so in its role as Lead

17   Plaintiff. And in any event, courts are not bound by such agreements, and Plaintiffs' Counsel's

18   request falls within the range for settlements of this size. *See Rodman*, 2018 WL 4030558, at *5.

19   Indeed, Class Counsel ultimately received a 20 percent award from an approximately $1 billion

20   settlement in the case on which the objector relies. *See In re Merck & Co., Inc. Sec., Deriv. &*

21   *"ERISA" Litig.*, No. 2:05-cv-02367, slip op. at 10-11 (D.N.J. June 28, 2016) (ECF No. 240-15 at

22   11-12).[18] Accordingly, the Court does not find the objector's argument persuasive as to the

23   adequacy of Union or the reasonableness of Plaintiffs' Counsel's fees.[19]

24

25   [18] *In re Merck* does not help Class Counsel as much as they represent, however. There, counsel's
     lodestar was $205.6 million, for a multiplier of roughly one. ECF No. 240-3 at 12.

26   [19] The Court notes, but does not rely on, the apparent history of objector's counsel, Steve Miller
     and John Pentz, as serial meritless objectors. *See, e.g.*, *Chambers v. Whirlpool Corp.*, 214 F.

27   Supp. 3d 877, 890 (C.D. Cal. 2016) (listing Miller as one of the "'serial' objectors who are well-
     known for routinely filing meritless objections to class action settlements for the improper purpose

28   of extracting a fee rather than to benefit the Class"); *In re Wal-Mart Wage & Hour Employment*
     *Practices Litig.*, No. 2:06CV00225-PMPPAL, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010)

24

The Court therefore overrules those objections.  Because the Court has verified under both the lodestar method and the percentage-recovery method that the amount of requested fees is reasonable, the Court awards 20 percent of the $480 million Settlement Amount, or $95,906040.956, to Plaintiffs' Counsel.

## V.  EXPENSES

### A.  Legal Standard

An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks and citation omitted).  To support an expense award, Plaintiffs should file an itemized list of their expenses by category, listing the total amount advanced for each category, allowing the Court to assess whether the expenses are reasonable. *Wren v. RGIS Inventory Specialists*, No. 06-cv-05778-JCS, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011), *supplemented*, No. 06-cv-05778-JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

### B.  Analysis

Although the Notice Packet informed class members that Plaintiffs' Counsel would seek reimbursement of up to $750,000 in expenses, ECF No. 240-3 at 21, counsel are now seeking reimbursement of $469,795.22 in expenses, ECF No. 239 at 30; ECF No. 240 ¶ 236.  Plaintiffs' Counsel have provided itemized lists of the costs and expenses separated by category.  ECF No. 240-9; *see also, e.g.*, ECF No. 240-5 at 97-132.  Most expenses resulted from retention of experts, research costs, and Freedom of Information Act request charges.  ECF No. 249-9 at 2.  The Court finds counsel's expenses reasonable and grants the request.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.  For the reasons set forth in its September 4, 2018 order, ECF No. 234, the Court confirms its certification of the class for settlement purposes only.

---

(noting Pentz's "documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class").

2.  For the reasons set forth in its September 4, 2018 order, ECF No. 234, the Court confirms its appointment of Bernstein Litowitz Berger & Grossman LP as Class Counsel.

3.  The Court grants final approval of the proposed settlement and plan of allocation.

4.  The Court grants the 253 requests to be excluded from the class.

5.  The Court grants the motion for attorneys' fees and litigation expenses.

**IT IS SO ORDERED.**

Dated:  December 17, 2018

_____
JON S. TIGAR
United States District Judge